## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

| | | |
|---|---|---|
| **HOPE ELLY and JOHN SMITH,** | ) | |
| **Plaintiffs,** | ) | **CIVIL ACTION NO.** |
| | ) | |
| **v.** | ) | |
| | ) | 3:19-cv-119DPJ-FKB |
| **MAGNOLIA HILL, LLC, and** | ) | |
| **CHURCHILL DOWNS** | ) | |
| **INCORPORATED,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

### I.      INTRODUCTION

Plaintiffs, Hope Elly and John Smith, file this Title III, ADA action, pursuant to 42 U.S.C. §12181, et. seq. In Count One of the Complaint, Plaintiffs seek to enjoin the Defendants to remove architectural barriers. In Count Two, Plaintiffs seek to enjoin Defendants to maintain practices, policies, and procedures necessary to maintain the premises free of architectural barriers both now and once the barriers are removed. In Count Three, Plaintiffs seek to enjoin the Defendants' use of the premises to provide full and equal enjoyment of the premises to the disabled. Counts Two and Three seek independent relief in addition to the removal of architectural barriers. Count Four seeks to enjoin the Defendants' failure to design and construct the facility to be readily accessible to and usable by individuals with disabilities. In Count Five, Plaintiffs seek to enjoin Defendants to remediate their website that fails to show the accessible features of Riverwalk. In Count Six, Plaintiffs seek to enjoin Defendants' use of the reservation system which screens out the disabled from being able to make reservations for a hotel room with accessible features for the disabled. In Count Seven, Plaintiffs seek to enjoin Defendants to remediate their website that fails to integrate an accessible platform to be usable by disabled individuals. In Count Eight, Plaintiffs seek to

enjoin Defendants' failure to take the necessary steps to ensure Plaintiffs are not denied services, segregated or otherwise treated differently than other individuals who do not have disabilities through the use of the mobile software applications.

### JURISDICTION, PARTIES, AND ARTICLE III STANDING

1. Because this is an action for declaratory and injunctive relief pursuant to Title III of the Americans with Disabilities Act, 42 U.S.C. §12181, et. seq., (hereinafter referred to as the "ADA") and its implementing regulations, this Court is vested with original jurisdiction under 28 U.S.C. §1331 and §1343.

2. Venue is proper in this Court, the United States District Court for the Southern District of Mississippi pursuant to Title 28, U.S.C. §1391 and the Local Rules of the United States District Court for the Southern District of Mississippi.

3. Plaintiff, Hope Elly, suffers from cerebrovascular accidents, which are more commonly known as strokes. These strokes have affected both her motor and sensory functions, which causes inactivity and/or paralysis of the muscles; therefore, maintaining balance, walking, and the ability to use her hands are extremely difficult. As a result of her disability, she relies on mobility aids for locomotion. The extent of Ms. Elly's physical disabilities limits her ability to care for herself, perform manual tasks, walk, stand, lift, bend, grab, twist, and work, all of which are major life activities pursuant to 42 U.S.C. § 12102 (2) (A). Ms. Elly is, accordingly, a person with a disability pursuant to the Americans with Disabilities Act, in that she has a physical impairment substantially limiting one or more major life activities.  42 U.S.C. § 12102; See also 28 C.F.R. § 36.104.

4. Plaintiff, John Smith was diagnosed with diabetes forty-four years ago. As a result of his diabetes, Mr. Smith consequently had a double amputation, losing both of his legs. Mr. Smith requires a wheelchair for mobility as a result of these amputations. The extent of Mr. Smith's physical problems limits his ability to care for himself, perform manual tasks, walk, stand, lift, bend, and work, all of which are major life activities pursuant to 42 U.S.C. § 12102 (2) (A). Mr. Smith is, accordingly, a person with a disability pursuant to the Americans with Disabilities Act, in that he has a physical impairment substantially limiting one or more major life activities.  42 U.S.C. § 12102; See also 28 C.F.R. § 36.104.

5. Defendant, Magnolia Hill, LLC, (hereinafter "Magnolia") is a limited liability company that is both registered to do business and is conducting business within the State of Mississippi sufficient to create both general and specific in personam jurisdiction. Upon information and belief from the property records on the Warren County GIS Internet Report, Magnolia Hill, LLC, "owns" the real property and improvements and "operates" the Riverwalk Casino Hotel located at 1046 Warrenton Rd, Vicksburg, MS 39180. 42 U.S.C. § 12182. The Riverwalk Casino Hotel is a place of public accommodation pursuant to 42 U.S.C. §12181(7). The Riverwalk Casino Hotel is a commercial facility in that the unit is intended for nonresidential use and affects commerce. 42 U.S.C. §12181(2)(A). Moreover, the establishment features a hotel, restaurants, shopping, casino games, and other entertainment which qualifies Riverwalk as a place of public accommodation pursuant to 42 U.S.C. § 12181(7).

6.  Defendant, Churchill Downs Incorporated, (hereinafter "Churchill"), is a corporation that is both registered to conduct business and is conducting business within the State of Mississippi sufficient to create both general and specific <u>in personam</u> jurisdiction. Upon information and belief, Churchill Downs Incorporated, "owns" the public internet website riverwalkvicksburg.com and the Riverwalk mobile application and its goods and services offered on the mobile app, and "operates" the world-wide websites services and mobile application services that are available to the public at Riverwalk. It is therefore, pursuant to 42 U.S.C. § 12182, responsible for creating, implementing, and maintaining policies, practices and procedures, and further, providing auxiliary aids and services to its web-based services and mobile application services. 42 U.S.C. § 12182.

7.  Pursuant to 42 U.S.C. § 12181(7) and 28 C.F.R. § 36.104, the Defendants' establishment is a place of public accommodation in that it is a place of lodging offering guest rooms for stays that are short term in nature; a variety of restaurants for food and drink, retail items for purchase, and other entertainment activities to the public. Accordingly, it is covered by the ADA and must comply with the Act.

8.  Pursuant to 42 U.S.C. § 12181(7) and 28 C.F.R. § 36.104, the Defendants' establishment is a place of public accommodation in that it is a place of lodging offering guest rooms for stays that are short term in nature; a variety of restaurants for food and drink, retail items for purchase, and other entertainment activities to the public. Accordingly, it is covered by the ADA and must comply with the Act.

9.  Defendants' hotel itself is a place of public accommodation pursuant to 42 U.S.C. § 12181(7)(a), which provides:

The following private entities are considered public accommodations for purposes of this subchapter, if the operations of such entities affect commerce:

> (A) an inn, hotel, motel, or other place of lodging, except for an establishment located within a building that contains not more than five rooms for rent or hire and that is actually occupied by the proprietor of such establishment as the residence of such proprietor.

In particular, the hotel rooms are a "place of lodging", pursuant to 28 C.F.R. § 36.104, which provides:

> *Place of public accommodation* means a facility operated by a private entity whose operations affect commerce and fall within at least one of the following categories –
>
> (1) Place of lodging, except for an establishment located within a facility that contains not more than five rooms for rent or hire and that actually is occupied by the proprietor of the establishment as the residence of the proprietor. For purposes of this part, a facility is a "place of lodging" if it is –
>
>> (i) An inn, hotel, or motel; or
>>
>> (ii) A facility that –
>>
>>> (A) Provides guest rooms for sleeping for stays that primarily are short-term in nature (generally 30 days or less) where the occupant does not have the right to return to a specific room or unit after the conclusion of his or her stay; and
>>>
>>> (B) Provides guest rooms under conditions and with amenities similar to a hotel, motel, or inn, including the following –
>>>
>>>> (1) On- or off-site management and reservations service;

(2)  Rooms available on a walk-up or call-in basis;

(3)  Availability of housekeeping or linen service; and

(4)  Acceptance of reservations for a guest room type without guaranteeing a particular unit or room until check-in, and without a prior lease or security deposit.

10.  Plaintiffs' stay at the hotel establishes their conformity to the elements of 28 C.F.R. § 36.104, because the hotel was rented to them for a short-term stay, (less than 30 days); Upon Plaintiffs' arrival at Riverwalk, they were required to check in at the front desk with an employee of Riverwalk; Plaintiffs had the opportunity to have housekeeping services during their stay; Plaintiffs did not have the right to return to their specific room after they checked-out of their hotel room at the front desk; the services provided were similar to other hotels or motels in that there was onsite employees and a reservation system, as well as reservations accepted without guaranteeing a particular room until check–in and without a prior lease; and housekeeping or linen service was available.

11.  All events giving rise to this lawsuit occurred in the Southern District of Mississippi and the Defendants are citizens thereof.

12.  Plaintiff Hope Elly vacations in Vicksburg because she enjoys various casino resorts as well as the entertainment Vicksburg offers. Ms. Elly enjoys the shopping, museums, southern cuisines and resorts that offer all sorts of activities and entertainment. More specifically, Ms. Elly enjoys Riverwalk, which is the subject of this action. Ms. Elly specifically and definitely intends to continue going to

Riverwalk when she travels to Vicksburg. Ms. Elly does not know exactly when she will go back to Riverwalk because she has not planned out every trip nor every meal for the rest of her life. Such specific planning is not necessary to invoke the ADA. See, *e.g.* <u>*Parr v. L & L Drive Inn Restaurant*</u> 96 F. Supp.2d 1065, 1079 (D. Haw 2000) and <u>*Segal v. Rickey's Restaurant and Lounge, Inc*</u>. No. 11-61766-cn, (S.D. Fla 2012) ("*Specification as to date and time of return to this public accommodation is impossible due to the nature of the event. Fast food patrons visit such restaurants at the spur of the moment*".). Ms. Elly definitely intends to return to Riverwalk, however, not only to sleep, play casino games, shop, drink, eat, and enjoy the entertainment and other activities but also to see if Riverwalk will do the repairs to become ADA compliant. Ms. Elly will continue to return even after the repairs are made because of Riverwalk Casino Hotel's known hospitality, views of the Mississippi River, 80 hotel rooms, including suites and some of the best southern hospitality dining and variety gaming entertainment.

13.  Plaintiff John Smith enjoys vacationing in Vicksburg, Mississippi because he enjoys the different type of entertainment that the city offers as well as the nightlife. Mr. Smith enjoys the outgoing social lifestyle whether it is playing casino games or enjoying the night life at the resorts that offer all sorts of social activities and entertainment. More specifically, Mr. Smith enjoys Riverwalk, which is the subject of this action. Mr. Smith specifically and definitely intends to continue going to Riverwalk when he travels to the Vicksburg because he enjoys the establishment including the entertainment. Mr. Smith does not know exactly when he will go back to Riverwalk because he has not planned out every trip nor every meal for the rest

of his life. Such specific planning is not necessary to invoke the ADA. See, *e.g.*

*Parr v. L & L Drive Inn Restaurant* 96 F. Supp.2d 1065, 1079 (D. Haw 2000) and

*Segal v. Rickey's Restaurant and Lounge, Inc.* No. 11-61766-cn, (S.D. Fla 2012)

("*Specification as to date and time of return to this public accommodation is*

*impossible due to the nature of the event. Fast food patrons visit such restaurants*

*at the spur of the moment*"). Mr. Smith definitely intends to return to Riverwalk,

however, not only to enjoy the nightlife, sleep, play casino games, shop, drink, eat,

and enjoy the entertainment and other social activities, but also to see if Riverwalk

will do the repairs to become ADA compliant and will continue to do so in the

future to ensure Defendants maintains its hotel and casino to accessibility

standards. Mr. Smith will continue to return even after the repairs are made because

of Riverwalk Casino Hotel's known hospitality, views of the Mississippi River, 80

hotel rooms, including suites and some of the best southern hospitality dining and

variety gaming entertainment.

14.   Because of the barriers described below in paragraph 27 and throughout the

Complaint, Plaintiffs have been denied full and equal enjoyment of the Defendants'

premises on the basis of their disabilities.

15.   Plaintiffs accordingly, have Article III standing to pursue this case because (1) they

are disabled, pursuant to the statutory and regulatory definition; (2) the Defendants'

hotel, casino and other entertainment complex is a place of public accommodation,

pursuant to the statutory and regulatory definition; (3) they have suffered a concrete

and particularized injury by being denied access to Riverwalk by architectural

barriers, by being denied access by the Defendants' practices described throughout

this Complaint, and by Defendants' denial of the use of Riverwalk for their full and equal enjoyment as the able-bodied, as described throughout the Complaint, and (4) because of these injuries, there exists a genuine threat of imminent future injury, as described in paragraph 25.

## II.    PLAINTIFFS' CLAIMS
## ADA, TITLE III

16. On or about July 26, 1990, Congress enacted Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12181 et.seq. Commercial enterprises were provided one and a half years from enactment of the statute to implement its requirements. The effective date of Title III of the ADA was January 26, 1992. (42 U.S.C. §12181; 20 C.F.R. §36.508 (A); *See also*, § 36.304).

17. Pursuant to 42 U.S.C. § 12181(7) and 28 C.F.R. § 36.104, the Defendants' establishment is a place of public accommodation in that it provides a hotel, restaurants, shopping, casino games, among other services to the public. Accordingly, it is covered by the ADA and must comply with the Act.

## COUNT ONE
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, TITLE III
## 42 U.S.C. § 12182(b)(2)(A)(iv)
### *(Architectural Barriers)*

**Defendants' Existing Facility Is Subject to the 2010 ADA Design Standards for the Portions of the Facility Addressed in This Complaint**

18. Plaintiffs are informed and believe based on publicly available information that the establishment in which Riverwalk is located at 1046 Warrenton Rd, Vicksburg, MS 39180, was originally constructed in 2008.

19. Plaintiffs are further informed and believe based on publicly available information that the establishment in which Riverwalk is located at 1046 Warrenton Rd, Vicksburg, MS 39180, underwent alterations and/or improvements to the establishment as recent as 2018.

20. The ADA was enacted requiring that facilities constructed prior to January 26, 1992, are considered an "existing" "facility, such that those facilities must remove architectural barriers where such removal is readily achievable. 42 U.S.C. § 12182(b)(2)(A)(iv). All "alterations" made to existing facilities after January 26, 1992, and all "new construction" after January 26, 1993, must be *readily accessible to and usable by individuals with disabilities*, including *individuals who use wheelchairs*. 42 U.S.C. § 12183(a) and (b). 28 *C.F.R.* § 36.402. "Readily accessible to and usable by. . ." is the "new construction" standard, which requires compliance with the Department of Justice standards. 42 U.S.C. § 12183(a)(1); 28 *C.F.R.* § 36.406. The only defense for failing to provide readily accessible and usable buildings constructed under the "new construction" standards is if the design and construction of the building to be readily accessible and usable is "structurally impracticable". 42 U.S.C. § 12183(a)(1). The "structural impracticability" defense applies only in rare circumstances of extraordinary terrain. 28 *C.F.R.* § 36.401(c). "Readily accessible to and usable by. . ." is also the "alterations" standard. 42 U.S.C. § 12183(a)(2). "Alterations" must be made to the maximum extent feasible. 42 U.S.C. § 12183(a)(2); 28 *C.F.R.* § 36.402. An alteration is a change to a place of public accommodation or commercial facility that affects or could affect the usability of the facility or any part thereof. 28 *C.F.R.* § 36.402(b).

21. New construction and alterations must comply with either the Justice Department's 1991 Standards for Accessible Design, or the 2010 Standards for Accessible Design. 28 *C.F.R.* § 36.406 establishes whether the 1991 Standards for Accessible Design or 2010 Standards for Accessible Design apply: New construction and alterations subject to §§ 36.401 or 36.402 shall comply with the 1991 Standards if the date when the last application for a building permit or permit extension is certified to be complete by a State, county, or local government is before September 15, 2010, or if no permit is required, if the start of physical construction or alterations occurs before September 15, 2010. 28 *C.F.R.* § 36.406(a)(1). New construction and alterations subject to §§ 36.401 or 36.402 shall comply either with the 1991 Standards or with the 2010 Standards if the date when the last application for a building permit or permit extension is certified to be complete by a State, county, or local government is on or after September 15, 2010, and before March 15, 2012, or if no permit is required, if the start of physical construction or alterations occurs on or after September 15, 2010, and before March 15, 2012. 28 *C.F.R.* § 36.406(a)(2). New construction and alterations subject to §§ 36.401 or 36.402 shall comply with the 2010 Standards if the date when the last application for a building permit or permit extension is certified to be complete by a State, county, or local government is on or after March 15, 2012, or if no permit is required, if the start of physical construction or alterations occurs on or after March 15, 2012. *Where the facility does not comply with the 1991 Standards, the 2010 Standards are applicable.* See 28 C.F.R. § 36.406(5)(ii) which states, "Newly constructed or altered facilities or elements covered by §§ 36.401 or 36.402 that

were constructed or altered before March 15, 2012 and that do not comply with the 1991 Standards shall, on or after March 15, 2012, be made accessible in accordance with the 2010 Standards."

22.  For most of the architectural barriers at issue in this case, the 2010 Standards for Accessible Design are applicable.

**Plaintiffs' Concrete and Particularized Standing to Pursue an Injunction**

23.  The Defendants have discriminated, and continue to discriminate, against the Plaintiffs, and others who are similarly situated, by denying full and equal access to, and full and equal enjoyment of goods, services, facilities, privileges, advantages and/or accommodations at Riverwalk in derogation of 42 U.S.C. § 12101 et. seq., and as prohibited by 42 U.S.C. § 12182 et-seq. As "new construction", the building must be readily accessible to and usable by individuals with disabilities. 42 U.S.C. § 12183 (a) and (b). Defendants' failure to remove the existing barriers thus violates 42 U.S.C. § 12182(b)(2)(A)(iv), which requires removal of architectural barriers.

24.  As described above, prior to the filing of this lawsuit, Plaintiffs were denied full and safe access to all of the benefits, accommodations and services offered to individuals without disabilities within and about the Defendants' facility. Plaintiffs' access was inhibited by each of the described architectural barriers detailed in this Complaint which remain at the facility in violation of the ADA. Because of the foregoing, Plaintiffs have suffered an injury-in-fact in precisely the manner and form that the ADA was enacted to guard against.

25. Plaintiffs have definite plans to return to Riverwalk in the future, as described in paragraphs 12 and 13. Plaintiffs will return to Riverwalk within the next few months not only to stay, shop, eat, drink, and enjoy other entertainment, but also to see if Riverwalk has repaired the barriers, and changed its practices and procedures. Plaintiffs will continue to do so in the near future and even when Riverwalk is repaired. Also, and of vital importance, the barriers are not just created by construction issues; instead many of them are created by human activity, from the way management and workers at Riverwalk use Riverwalk's physical facilities. The barriers created by human activity will need to be reviewed forever, to be sure Defendants' management and workers continuously act in a manner that does not create barriers. Absent remedial action by Defendants, Plaintiffs will continue to encounter the architectural barriers, and the discriminatory policies, practices, and procedures described herein and as a result, be discriminated against by Defendants on the basis of their disabilities. As persuasive authority and also as a matter of common sense, the Eleventh Circuit, held in *Houston v. Marod Supermarkets*, that when architectural barriers have not been remedied "*there is a 100% likelihood that plaintiff... will suffer the alleged injury again when he returns to the store*." Due to the definiteness of Plaintiffs' future plans to continue visiting the subject facility and their past patronage, there exists a genuine threat of imminent future injury, *Houston v. Marod, supra*. Plaintiffs' intent to return is plausible, as pleaded above. *Houston, supra*.

**ARCHITECTURAL BARRIERS**

26. Pursuant to the mandates of 42 U.S.C. § 12134(a), on July 26, 1991, the Department of Justice, Office of the Attorney General, promulgated Federal Regulations to implement the requirements of the ADA. 28 C.F.R. Part 36.

27. Plaintiffs have been throughout all the parking areas at Riverwalk and from the parking areas to the entrances, from the entrances to and throughout the restrooms, the restrooms themselves; from the entrances to and throughout the dining areas, the dining areas themselves, the common areas including the hotel lobby, casinos, gift shop, the pool, the fitness area, the sales and service counters, throughout circulation paths and accessible routes, from the parking areas to and throughout the common areas including the service areas, paths of travel, and in particular but not limited to all of which is more specifically described below. Moreover, Defendants' facility located at 1046 Warrenton Rd, Vicksburg, MS 39180, more commonly known as "Riverwalk", violates the ADA in the hotel guest rooms, check-in and lobby area, parking areas, the entranceways, from the parking areas to and throughout the common areas and the retail service areas, bathrooms, paths of travel, common areas, and in particular but not limited to:

(1) Defendants provide a parking area with parking spaces that have routes connecting the parking spaces to the entrance of the establishment for able-bodied individuals, but fails to provide that same level of access by providing an ADA accessible route from the accessible parking spaces to the accessible entrance for non-able-bodied individual which segregates and relegates individuals with disabilities to inferior benefits of the goods and

services provided at Defendants' place of public accommodation which includes but is not limited to the following failures of Defendants:

(a) Defendants fail to maintain the parking area and its associated accessible route in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which includes but is not limited to parking spaces failing to be located on the shortest accessible route to the entrance which has the discriminatory effects of rendering the parking spaces and its associated elements as unusable by disabled individuals;

(b) The parking area fails to maintain the required amount of parking spaces, including its associated access aisle, in operable condition by conforming with the ADA Standards for Accessible Design so that the level parking spaces measure 96 inches wide minimum with adjoining compliant access aisles that measure 60 inches wide minimum and connect to an accessible route to the entrance of the establishment;

(c) The parking area fails to maintain the required amount of parking spaces, including its associated access aisle, in operable condition by conforming with the ADA Standards for Accessible Design so that the parking spaces adjacent access aisles extends the full length of the parking space and is marked so as to discourage parking in the access aisle which renders it unusable by the disabled;

(d) The parking area fails to maintain the required amount of parking spaces, including its adjoining access aisle, in operable condition by conforming with the ADA Standards for Accessible Design so that the parking spaces adjacent access aisles do not overlap the vehicular way;

**(e)** The parking area fails to maintain the required amount of parking spaces, including its adjoining access aisle, in operable condition by conforming with the ADA Standards for Accessible Design so that the parking spaces maintain a ground surface that is level;

**(f)** The parking area fails to maintain the required amount of parking spaces, including its adjoining access aisle, in operable condition by conforming with the ADA Standards for Accessible Design so that the parking spaces are identified with signage including the international symbol of accessibility that is mounted 60 inches minimum above the finished floor or ground surface measured to the bottom of the sign;

**(g)** The parking area fails to maintain the required amount of parking spaces, including its adjoining access aisle, in operable condition by conforming with the ADA Standards for Accessible Design so that the parking spaces and its adjacent access aisles are designed or otherwise maintained in a way so that when cars and vans, when parked, cannot obstruct the required clear width of adjacent accessible routes and render the parking space as unusable by the disabled;

**(2)** Defendants provide a parking area with parking spaces that have routes connecting the parking spaces to the entrance of the establishment for able-bodied individuals, but fails to provide that same level of access by providing an ADA accessible route from the accessible van parking spaces  to the accessible entrance for non-able-bodied individual which segregates and relegates individuals with disabilities to inferior benefits of the goods and services provided at Defendants' place of public accommodation which includes but is not limited to the following failures of Defendants:

**(a)** Defendants fail to maintain the parking area and its associated accessible route in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which includes but is not limited to van parking spaces failing to be located on the accessible route to the entrance which has the discriminatory effects of rendering the parking spaces and its associated elements as unusable by disabled individuals;

**(b)** The parking area fails to maintain the required amount of accessible van accessible parking spaces, including its associated access aisle, in operable condition by conforming with the ADA Standards for Accessible Design so that the van parking space measures 132 inches wide minimum with an adjoining compliant access aisle that measures 60 inches wide minimum, or alternatively a 96 inch wide space with an adjoining 96 inch wide access aisle, and connects to an adjoining accessible route to the entrance of the establishment;

**(c)** The parking area fails to maintain the required amount of accessible van parking spaces, including its associated access aisle, in operable condition by conforming with the ADA Standards for Accessible Design so that the van parking spaces adjacent access aisle extends the full length of the parking space and is marked so as to discourage parking in the access aisle which renders it unusable by the disabled;

**(d)** The parking area fails to maintain the required amount of accessible van parking spaces, including its adjoining access aisle, in operable condition by conforming with the ADA Standards for Accessible Design so that the parking spaces adjacent access aisles do not overlap the vehicular way;

**(e)** The parking area fails to maintain the required amount of parking spaces, including its adjoining access aisle, in operable condition by conforming with the ADA Standards for Accessible Design so that the parking spaces maintain a ground surface that is level;

**(f)** The parking area fails to maintain the required amount of accessible van parking spaces, including its adjoining access aisle, in operable condition by conforming with the ADA Standards for Accessible Design so that the parking spaces are identified with van accessible signage including the international symbol of accessibility that is mounted 60 inches minimum above the finished floor or ground surface measured to the bottom of the sign;

**(g)** The parking area fails to maintain the required amount of accessible van parking spaces, including its adjoining access aisle, in operable condition by conforming with the ADA Standards for Accessible Design so that the parking spaces and its adjacent access aisles are designed or otherwise maintained in a way so that when cars and vans, when parked, cannot obstruct the required clear width of adjacent accessible routes and render the parking space as unusable by the disabled;

**(3)** Defendants provide outdoor seating benches for able-bodied individuals to sit and relax while at the casino, but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to other individuals without disabilities, which includes but is not limited to the following failures of Defendants:

**(a)** Defendants fail to maintain a seating bench in conformance with the ADA Standards for Accessible Design so that a clear floor or ground space is provided and positioned at the end of the seat and parallel to the short axis of the seat;

**(b)** Defendants fail to maintain a seating bench in conformance with the ADA Standards for Accessible Design in all the ways that it is required to be readily accessible to and usable by disabled individuals which includes but is not limited to maintaining a seat that is a minimum of 42 inches long and 20 inches deep minimum to 24 inches deep maximum;

**(c)** Defendants fail to maintain a seating bench in conformance with the ADA Standards for Accessible Design in all the ways that it is required to be readily accessible to and usable by disabled individuals which includes but is not limited to the seat being affixed to the wall, or maintaining a back support that is 42 inches long minimum, extending 2 inches maximum above the seat surface to a point 18 inches above the seat surface so that the back support measures a maximum of a 2.5 inches from the rear edge of the seat measured horizontally;

**(d)** Defendants fail to maintain a seating bench in conformance with the ADA Standards for Accessible Design so that the top of the seat surface is 17 inches minimum and 19 inches maximum above the finish floor or ground;

**(e)** Defendants fail to maintain a seating bench in conformance with the ADA Standards for Accessible Design in all the ways that it is required to be readily accessible to and usable by disabled individuals which includes but is not limited to maintaining the structural strength of the seat so that when a vertical or horizontal

force of 250 pounds is applied at any point on the seat, fastener, mounting device, or supporting structure, the seat is not rendered unusable by the disabled;

(4)   Defendants provide sales and service counters for able-bodied individuals to check-in and otherwise receive services that are provided at each counter but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to other individuals without disabilities, which includes but is not limited to the following failures of Defendants:

(a)   There is not at least one of each type of sales and service counter that is maintained in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which has the discriminatory effects of rendering the counter, its associated elements, and services offered at the counter as unusable by disabled individuals;

(b)   There is not at least one of each type of sales and service counter that is maintained in operable condition by conforming with the ADA Standards for Accessible Design so that the accessible counter and its associated elements are located adjacent to a walking surface complying with 403;

(c)   There is not  at least one of each type of sales and service counter that is maintained in operable condition by conforming with the ADA Standards for Accessible Design so that a portion of the counter surface that is 36 inches long minimum and 36 inches high maximum above the finish floor is readily usable by disabled individuals which includes maintaining a clear floor or ground space complying

with 305 positioned for either a parallel approach adjacent to the 36 inch minimum length of counter, or, alternatively, A portion of the counter surface that is 30 inches long minimum and 36 inches high maximum with Knee and toe space complying with 306 provided under the counter and a clear floor or ground space complying with 305 positioned for a forward approach to the counter;

(d) There is not at least one of each type of sales and service counter that is maintained in operable condition with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which includes but is not limited to maintaining the clear counter surface free of obstructions or any other clutter that could have the discriminatory effects of rendering the counter and its associated benefits and services as unusable by the disabled;

(e) There is not at least one of each type of sales and service counter that is maintained in operable condition with the ADA Standards for Accessible Design so that accessible counter extends the same depth as the non-accessible portion of the counter;

(f) There is not at least one of each type of sales and service counter that is maintained in operable condition with the ADA Standards for Accessible Design so that a credit card payment terminal is positioned or otherwise maintained in a readily accessible to and independently usable location at the accessible counter which has the discriminatory effects in practice of affording disabled individuals an unequal opportunity to independently transact business in the same manner as non-disabled individuals;

**(g)** Defendants fail to maintain the accessible features of the sales and service counter that are required to be readily accessible to and usable by individuals with disabilities;

**(5)** Defendants provide a sales and service counter for able-bodied individuals at the gift shop and otherwise receive services that are provided at the counter but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to other individuals without disabilities, which includes but is not limited to the following failures of Defendants:

**(a)** There is not at least one sales and service counter that is maintained in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which has the discriminatory effects of rendering the counter, its associated elements, and services offered at the counter as unusable by disabled individuals;

**(b)** There is not at least one sales and service counter that is maintained in operable condition by conforming with the ADA Standards for Accessible Design so that the accessible counter and its associated elements are located adjacent to a walking surface complying with 403;

**(c)** There is not  at least one sales and service counter that is maintained in operable condition by conforming with the ADA Standards for Accessible Design so that a portion of the counter surface that is 36 inches long minimum and 36 inches high maximum above the finish floor is readily usable by disabled individuals which

includes maintaining a clear floor or ground space complying with 305 positioned for either a parallel approach adjacent to the 36 inch minimum length of counter, or, alternatively, A portion of the counter surface that is 30 inches long minimum and 36 inches high maximum with Knee and toe space complying with 306 provided under the counter and a clear floor or ground space complying with 305 positioned for a forward approach to the counter;

(d)  There is not at least one sales and service counter that is maintained in operable condition with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which includes but is not limited to maintaining the clear counter surface free of obstructions or any other clutter that could have the discriminatory effects of rendering the counter and its associated benefits and services as unusable by the disabled;

(e)  There is not at least one sales and service counter that is maintained in operable condition with the ADA Standards for Accessible Design so that accessible counter extends the same depth as the non-accessible portion of the counter;

(f)  There is not at least one sales and service counter that is maintained in operable condition with the ADA Standards for Accessible Design so that a credit card payment terminal is positioned or otherwise maintained in a readily accessible to and independently usable location at the accessible counter which has the discriminatory effects in practice of affording disabled individuals an unequal opportunity to independently transact business in the same manner as non-disabled individuals;

**(g)** Defendants fail to maintain the accessible features of the sales and service counter that are required to be readily accessible to and usable by individuals with disabilities;

**(6)** Defendants provide hotel guest rooms for able bodied individuals but fails to provide ADA accessible hotel guest rooms for individuals with disabilities which prohibits individuals with disabilities from the full and equal opportunity to access the goods and services at the Riverwalk which includes but is not limited to the following failures of Defendants:

**(a)** There is not the required amount of ADA accessible guest rooms that provide the required level of ADA compliant toilet and bathing facilities within the guest rooms;

**(b)** The allegedly accessible guest rooms fail to provide ADA compliant shower compartments which includes both the transfer type compartments and its associated accessible elements and roll-in shower compartments and its associated accessible elements;

**(c)** The existing shower compartments fail to provide grab bars that conform to the ADA Standards for Accessible Design which prohibits disabled individuals from being afforded the opportunity to independently use the compartment;

**(d)** The existing practice at Riverwalk is to provide disabled individuals with portable bench seats for the showers rather than making its guest rooms compliant with the ADA Standards for Accessible Design;

(7)    Defendants provide an elevator for able-bodied individuals, but fails to provide an ADA accessible elevator for non-able-bodied individuals, which includes but is not limited to the following failures by Defendants:

   (a) Defendants require guests to use the room key card to activate the elevator which has a discriminatory effect in practice of requiring individuals with disabilities from independently being afforded the opportunity to ride the elevator up to their room;

(8)    Defendants provide indoor lounge seating for able-bodied individuals to sit and relax while at the casino, but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to other individuals without disabilities, which includes but is not limited to the following failures of Defendants:

   (a) Defendants fail to maintain lounge seating in conformance with the ADA Standards for Accessible Design so that a clear floor or ground space is provided and positioned at the end of the seat and parallel to the short axis of the seat;

   (b) Defendants fail to maintain lounge seating in conformance with the ADA Standards for Accessible Design in all the ways that it is required to be readily accessible to and usable by disabled individuals which includes but is not limited to maintaining a seat that is a minimum of 42 inches long and 20 inches deep minimum to 24 inches deep maximum;

   (c) Defendants fail to maintain lounge seating in conformance with the ADA Standards for Accessible Design in all the ways that it is required to be readily accessible to and usable by disabled individuals which includes but is not limited to the seat being affixed to the wall, or maintaining a back support that is 42 inches long

minimum, extending 2 inches maximum above the seat surface to a point 18 inches above the seat surface so that the back support measures a maximum of a 2.5 inches from the rear edge of the seat measured horizontally;

**(d)** Defendants fail to maintain lounge seating in conformance with the ADA Standards for Accessible Design so that the top of the seat surface is 17 inches minimum and 19 inches maximum above the finish floor or ground;

**(e)** Defendants fail to maintain lounge seating in conformance with the ADA Standards for Accessible Design in all the ways that it is required to be readily accessible to and usable by disabled individuals which includes but is not limited to maintaining the structural strength of the seat so that when a vertical or horizontal force of 250 pounds is applied at any point on the seat, fastener, mounting device, or supporting structure, the seat is not rendered unusable by the disabled;

**(9)** Defendants provide a men's restroom nearest the entrance of the casino for able-bodied individuals, but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to other individuals without disabilities, which includes but is not limited to the following failures of Defendants:

**(a)** Defendants maintain signage designating and directing able-bodied individuals to the restrooms but fails to maintain signage conforms to the ADA Standards for Accessible Design so that the international symbol of accessibility is designating and directing disabled individuals to the accessible restroom;

**(b)** There is not at least one toilet compartment that is maintained or otherwise configured in conformance with the ADA Standards for Accessible Design in all

the ways that are required to be readily accessible to and usable by disabled individuals including the maneuvering clearance to approach the compartment, clear floor space at the compartment door, and among other associate design requirements which has the discriminatory effects of rendering the restroom and its associated elements as unusable by the disabled;

**(c)** The restroom fails to be maintain at least one ADA accessible toilet compartment in operable condition by conforming with the ADA Standards for Accessible Design so that the toilet compartment is arranged for either a left or right hand approach to the compartment and otherwise maintained in the condition required by the ADA Standards for accessible Design so that the toilet compartment and its associated elements are not rendered unusable by the disabled;

**(d)** The restroom fails to maintain at least one ADA accessible toilet compartment in operable condition by conforming with the ADA Standards for Accessible Design so that the toilet compartment is arranged for either a left or right hand approach with the center line of the water closet located 16-18 inches from the side wall with the top of the water closet seat surface 17-19 inches above the finished floor and otherwise readily accessible to and usable by disabled individuals;

**(e)** The restroom fails to maintain at least one ADA Accessible toilet compartment in operable condition by conforming with the ADA Standards for Accessible Design so that the toilet paper dispensers operable parts comply with the applicable standards for accessible design and is otherwise located 7-9 inches from the front of the water closet;

**(f)** The restroom fails to maintain at least one ADA accessible toilet compartment in operable condition by conforming with the ADA Standards for Accessible Design so that the side wall grab bar conforms with the ADA Standards for Accessible Design in all the ways that it is required to be readily accessible to and usable by disabled individuals which includes but is not limited to maintaining a minimum of 1 ½ inches of space between the grab bar and projecting objects below and a minimum of 12 inches of space between the grab bar and projecting objects above;

**(g)** The restroom fails to maintain at least one ADA accessible toilet compartment in operable condition by conforming with the ADA Standards for Accessible Design so that the rear wall grab bar conforms with the ADA Standards for Accessible Design in all the ways that it is required to be readily accessible to and usable by disabled individuals which includes but is not limited to maintaining a minimum of 1 ½ inches of space between the grab bar and projecting objects below and a minimum of 12 inches of space between the grab bar and projecting objects above;

**(h)** The restroom fails to maintain at least one ADA Accessible toilet compartment in operable condition or otherwise configured in away by conforming with the ADA Standards for Accessible Design so that the toilet compartment maintains a toilet compartment door and its associated hardware in an accessible and usable condition by the disabled;

**(i)** The coat hook fails to be maintained in operable condition by conforming with the ADA Standards for Accessible Design so that the coat hook measures the required height for unobstructed and/or obstructed reach ranges;

**(j)** Defendants fail to maintain the accessible features of the restroom that are required to be readily accessible to and usable by individuals with disabilities;

**(10)** Defendants provide a lavatory in the men's restroom nearest the entrance of the casino for able-bodied individuals, but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to individuals without disabilities, which includes but is not limited to the following failures of Defendants:

**(a)** The lavatory fails to be maintained in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which has the discriminatory effect of rendering the lavatory sink and its associated elements as unusable by the disabled;

**(b)** There is not at least one ADA accessible lavatory that is maintained in a usable condition so that the top surface of the rim on the lavatory sink measures a maximum of 34 inches above the finished floor and positioned for a forward approach;

**(c)** The clear floor space at the lavatory sink fails to be maintained in conformance with the ADA Standards for Accessible Design so that the knee and toe clearance is not restricting the usability by disabled individuals;

**(d)** There is not at least one lavatory with a mirror that is maintained in a usable condition so that the bottom reflecting surface of the mirror measures a maximum of 40 inches above the finished floor;

**(e)** The paper towel dispenser fails to be maintained in a usable condition so that the dispenser and its operable parts measure the required height for unobstructed and/or

obstructed reach ranges and do not require the use of tight grasping, twisting, and/or pinching of the wrist or otherwise restrict the continuous flow of paper;

(11)   The urinal fails to conform to the ADA Standards for Accessible Design in all the ways that it is required to be readily accessible to and usable by disabled individuals which includes but is not limited to maintaining the urinal so that the top surface of the rim measures 17 inches maximum above the finished floor and flush controls that measure the required height for unobstructed and/or obstructed reach ranges, with 36 inches of clear floor or ground space for a forward approach;

(12)   Defendants provide a women's restroom nearest the entrance of the casino for able-bodied individuals, but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to other individuals without disabilities, which includes but is not limited to the following failures of Defendants:

(a)   Defendants maintain signage designating and directing able-bodied individuals to the restrooms but fails to maintain signage conforms to the ADA Standards for Accessible Design so that the international symbol of accessibility is designating and directing disabled individuals to the accessible restroom;

(b)   There is not at least one toilet compartment that is maintained or otherwise configured in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals including the maneuvering clearance to approach the compartment, clear floor space at the compartment door, and among other associate design

requirements which has the discriminatory effects of rendering the restroom and its associated elements as unusable by the disabled;

**(c)** The restroom fails to be maintain at least one ADA accessible toilet compartment in operable condition by conforming with the ADA Standards for Accessible Design so that the toilet compartment is arranged for either a left or right hand approach to the compartment and otherwise maintained in the condition required by the ADA Standards for accessible Design so that the toilet compartment and its associated elements are not rendered unusable by the disabled;

**(d)** The restroom fails to maintain at least one ADA accessible toilet compartment in operable condition by conforming with the ADA Standards for Accessible Design so that the toilet compartment is arranged for either a left or right hand approach with the center line of the water closet located 16-18 inches from the side wall with the top of the water closet seat surface 17-19 inches above the finished floor and otherwise readily accessible to and usable by disabled individuals;

**(e)** The restroom fails to maintain at least one ADA Accessible toilet compartment in operable condition by conforming with the ADA Standards for Accessible Design so that the toilet paper dispensers operable parts comply with the applicable standards for accessible design and is otherwise located 7-9 inches from the front of the water closet;

**(f)** The restroom fails to maintain at least one ADA accessible toilet compartment in operable condition by conforming with the ADA Standards for Accessible Design so that the side wall grab bar conforms with the ADA Standards for Accessible Design in all the ways that it is required to be readily accessible to and usable by

disabled individuals which includes but is not limited to maintaining a minimum of
1 ½ inches of space between the grab bar and projecting objects below and a
minimum of 12 inches of space between the grab bar and projecting objects above;

**(g)** The restroom fails to maintain at least one ADA accessible toilet compartment in
operable condition by conforming with the ADA Standards for Accessible Design
so that the rear wall grab bar conforms with the ADA Standards for Accessible
Design in all the ways that it is required to be readily accessible to and usable by
disabled individuals which includes but is not limited to maintaining a minimum of
1 ½ inches of space between the grab bar and projecting objects below and a
minimum of 12 inches of space between the grab bar and projecting objects above;

**(h)** The restroom fails to maintain at least one ADA Accessible toilet compartment in
operable condition or otherwise configured in away by conforming with the ADA
Standards for Accessible Design so that the toilet compartment maintains a toilet
compartment door and its associated hardware in an accessible and usable condition
by the disabled;

**(i)** The coat hook fails to be maintained in operable condition by conforming with the
ADA Standards for Accessible Design so that the coat hook measures the required
height for unobstructed and/or obstructed reach ranges;

**(j)** Defendants fail to maintain the accessible features of the restroom that are required
to be readily accessible to and usable by individuals with disabilities;

**(13)** Defendants provide a lavatory in the women's restroom nearest the entrance of the casino
for able-bodied individuals, but fails to afford non-able-bodied individuals the same
opportunity to participate in or benefit from a good, service, facility, privilege, advantage,

or accommodation that is equal to that experience afforded to individuals without disabilities, which includes but is not limited to the following failures of Defendants:

(a) The lavatory fails to be maintained in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which has the discriminatory effect of rendering the lavatory sink and its associated elements as unusable by the disabled;

(b) There is not at least one ADA accessible lavatory that is maintained in a usable condition so that the top surface of the rim on the lavatory sink measures a maximum of 34 inches above the finished floor and positioned for a forward approach;

(c) The clear floor space at the lavatory sink fails to be maintained in conformance with the ADA Standards for Accessible Design so that the knee and toe clearance is not restricting the usability by disabled individuals;

(d) There is not at least one lavatory with a mirror that is maintained in a usable condition so that the bottom reflecting surface of the mirror measures a maximum of 40 inches above the finished floor;

(e) The paper towel dispenser fails to be maintained in a usable condition so that the dispenser and its operable parts measure the required height for unobstructed and/or obstructed reach ranges and do not require the use of tight grasping, twisting, and/or pinching of the wrist or otherwise restrict the continuous flow of paper;

(14) Defendants provide a men's restroom near the cashier's area for able-bodied individuals, but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal

to that experience afforded to other individuals without disabilities, which includes but is not limited to the following failures of Defendants:

**(a)** Defendants maintain signage designating and directing able-bodied individuals to the restrooms but fails to maintain signage conforms to the ADA Standards for Accessible Design so that the international symbol of accessibility is designating and directing disabled individuals to the accessible restroom;

**(b)** There is not at least one toilet compartment that is maintained or otherwise configured in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals including the maneuvering clearance to approach the compartment, clear floor space at the compartment door, and among other associate design requirements which has the discriminatory effects of rendering the restroom and its associated elements as unusable by the disabled;

**(c)** The restroom fails to be maintain at least one ADA accessible toilet compartment in operable condition by conforming with the ADA Standards for Accessible Design so that the toilet compartment is arranged for either a left or right hand approach to the compartment and otherwise maintained in the condition required by the ADA Standards for accessible Design so that the toilet compartment and its associated elements are not rendered unusable by the disabled;

**(d)** The restroom fails to maintain at least one ADA accessible toilet compartment in operable condition by conforming with the ADA Standards for Accessible Design so that the side wall grab bar conforms with the ADA Standards for Accessible Design in all the ways that it is required to be readily accessible to and usable by

disabled individuals which includes but is not limited to maintaining a minimum of 1 ½ inches of space between the grab bar and projecting objects below and a minimum of 12 inches of space between the grab bar and projecting objects above;

**(e)** The restroom fails to maintain at least one ADA accessible toilet compartment in operable condition by conforming with the ADA Standards for Accessible Design so that the rear wall grab bar conforms with the ADA Standards for Accessible Design in all the ways that it is required to be readily accessible to and usable by disabled individuals which includes but is not limited to maintaining a 36 inch long grab bar installed so that it is located 12 inches on the closed side of the toilet room and 24 inches on the transfer side and mounted so that the top gripping surface measures 33-36 inches above the finished floor;

**(f)** The restroom fails to maintain at least one ADA Accessible toilet compartment in operable condition by conforming with the ADA Standards for Accessible Design so that the toilet paper dispensers operable parts comply with the applicable standards for accessible design and is otherwise located 7-9 inches from the front of the water closet;

**(g)** The restroom fails to maintain at least one ADA Accessible toilet compartment in operable condition or otherwise configured in away by conforming with the ADA Standards for Accessible Design so that the toilet compartment maintains a toilet compartment door and its associated hardware in an accessible and usable condition by the disabled;

**(h)** Defendants fail to maintain the accessible features of the restroom that are required to be readily accessible to and usable by individuals with disabilities;

(15)   Defendants provide an ambulatory toilet compartment in the men's restroom near the cashier's area for able-bodied individuals, but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to other individuals without disabilities, which includes but is not limited to the following failures of Defendants:

(a) There is not at least one ambulatory toilet compartment that is maintained or otherwise configured in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals including the maneuvering clearance to approach the compartment, clear floor space at the compartment door, and among other associate design requirements which has the discriminatory effects of rendering the restroom and its associated elements as unusable by the disabled;

(b) The restroom fails to be maintain at least one ADA accessible ambulatory toilet compartment in operable condition by conforming with the ADA Standards for Accessible Design so that the toilet compartment is arranged for either a left or right hand approach to the compartment and otherwise maintained in the condition required by the ADA Standards for accessible Design so that the toilet compartment and its associated elements are not rendered unusable by the disabled;

(c) The restroom fails to maintain at least one ADA accessible ambulatory toilet compartment in operable condition by conforming with the ADA Standards for Accessible Design so that the toilet compartment is arranged for either a left or right hand approach with the required maneuvering clearance maintained around the

water closet so that the maneuvering clear floor space around the water closet is not obstructed and consequently rendering the compartment as unusable by the disabled;

**(d)** The restroom fails to maintain at least one ADA accessible ambulatory toilet compartment in operable condition by conforming with the ADA Standards for Accessible Design so that the side wall grab bar conforms with the ADA Standards for Accessible Design in all the ways that it is required to be readily accessible to and usable by disabled individuals which includes but is not limited to maintaining a minimum of 1 ½ inches of space between the grab bar and projecting objects below and a minimum of 12 inches of space between the grab bar and projecting objects above;

**(e)** The restroom fails to maintain at least one ADA accessible ambulatory toilet compartment in operable condition by conforming with the ADA Standards for Accessible Design so that the rear wall grab bar conforms with the ADA Standards for Accessible Design in all the ways that it is required to be readily accessible to and usable by disabled individuals which includes but is not limited to maintaining a 36 inch long grab bar installed so that it is located 12 inches on the closed side of the toilet room and 24 inches on the transfer side and mounted so that the top gripping surface measures 33-36 inches above the finished floor;

**(f)** The restroom fails to maintain at least one ADA Accessible ambulatory toilet compartment in operable condition by conforming with the ADA Standards for Accessible Design so that the toilet paper dispensers operable parts comply with

the applicable standards for accessible design and is otherwise located 7-9 inches from the front of the water closet;

**(g)** The restroom fails to maintain at least one ADA Accessible ambulatory toilet compartment in operable condition or otherwise configured in away by conforming with the ADA Standards for Accessible Design so that the toilet compartment maintains a toilet compartment door and its associated hardware in an accessible and usable condition by the disabled;

**(16)** Defendants provide a lavatory in the men's restroom near the cashier's area for able-bodied individuals, but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to individuals without disabilities, which includes but is not limited to the following failures of Defendants:

**(a)** The lavatory fails to be maintained in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which has the discriminatory effect of rendering the lavatory sink and its associated elements as unusable by the disabled;

**(b)** There is not at least one ADA accessible lavatory that is maintained in a usable condition so that the top surface of the rim on the lavatory sink measures a maximum of 34 inches above the finished floor and positioned for a forward approach;

**(c)** The clear floor space at the lavatory sink fails to be maintained in conformance with the ADA Standards for Accessible Design so that the knee and toe clearance is not restricting the usability by disabled individuals;

**(d)** There is not at least one lavatory with a mirror that is maintained in a usable condition so that the bottom reflecting surface of the mirror measures a maximum of 40 inches above the finished floor;

**(e)** The paper towel dispenser fails to be maintained in a usable condition so that the dispenser and its operable parts measure the required height for unobstructed and/or obstructed reach ranges and do not require the use of tight grasping, twisting, and/or pinching of the wrist or otherwise restrict the continuous flow of paper;

**(17)** The urinal fails to conform to the ADA Standards for Accessible Design in all the ways that it is required to be readily accessible to and usable by disabled individuals which includes but is not limited to maintaining the urinal so that the top surface of the rim measures 17 inches maximum above the finished floor and flush controls that measure the required height for unobstructed and/or obstructed reach ranges, with 36 inches of clear floor or ground space for a forward approach;

**(18)** Defendants provide a women's restroom near the cashier's area for able-bodied individuals, but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to other individuals without disabilities, which includes but is not limited to the following failures of Defendants:

**(a)** Defendants maintain signage designating and directing able-bodied individuals to the restrooms but fails to maintain signage conforms to the ADA Standards for Accessible Design so that the international symbol of accessibility is designating and directing disabled individuals to the accessible restroom;

**(b)** There is not at least one toilet compartment that is maintained or otherwise configured in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals including the maneuvering clearance to approach the compartment, clear floor space at the compartment door, and among other associate design requirements which has the discriminatory effects of rendering the restroom and its associated elements as unusable by the disabled;

**(c)** The restroom fails to be maintain at least one ADA accessible toilet compartment in operable condition by conforming with the ADA Standards for Accessible Design so that the toilet compartment is arranged for either a left or right hand approach to the compartment and otherwise maintained in the condition required by the ADA Standards for accessible Design so that the toilet compartment and its associated elements are not rendered unusable by the disabled;

**(d)** The restroom fails to maintain at least one ADA accessible toilet compartment in operable condition by conforming with the ADA Standards for Accessible Design so that the side wall grab bar conforms with the ADA Standards for Accessible Design in all the ways that it is required to be readily accessible to and usable by disabled individuals which includes but is not limited to maintaining a minimum of 1 ½ inches of space between the grab bar and projecting objects below and a minimum of 12 inches of space between the grab bar and projecting objects above;

**(e)** The restroom fails to maintain at least one ADA accessible toilet compartment in operable condition by conforming with the ADA Standards for Accessible Design so that the rear wall grab bar conforms with the ADA Standards for Accessible

Design in all the ways that it is required to be readily accessible to and usable by disabled individuals which includes but is not limited to maintaining a 36 inch long grab bar installed so that it is located 12 inches on the closed side of the toilet room and 24 inches on the transfer side and mounted so that the top gripping surface measures 33-36 inches above the finished floor;

(f) The restroom fails to maintain at least one ADA Accessible toilet compartment in operable condition by conforming with the ADA Standards for Accessible Design so that the toilet paper dispensers operable parts comply with the applicable standards for accessible design and is otherwise located 7-9 inches from the front of the water closet;

(g) The restroom fails to maintain at least one ADA Accessible toilet compartment in operable condition or otherwise configured in away by conforming with the ADA Standards for Accessible Design so that the toilet compartment maintains a toilet compartment door and its associated hardware in an accessible and usable condition by the disabled;

(h) Defendants fail to maintain the accessible features of the restroom that are required to be readily accessible to and usable by individuals with disabilities;

(19) Defendants provide an ambulatory toilet compartment in the women's restroom near the cashier's area for able-bodied individuals, but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to other individuals without disabilities, which includes but is not limited to the following failures of Defendants:

(a) There is not at least one ambulatory toilet compartment that is maintained or otherwise configured in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals including the maneuvering clearance to approach the compartment, clear floor space at the compartment door, and among other associate design requirements which has the discriminatory effects of rendering the restroom and its associated elements as unusable by the disabled;

(b) The restroom fails to be maintain at least one ADA accessible ambulatory toilet compartment in operable condition by conforming with the ADA Standards for Accessible Design so that the toilet compartment is arranged for either a left or right hand approach to the compartment and otherwise maintained in the condition required by the ADA Standards for accessible Design so that the toilet compartment and its associated elements are not rendered unusable by the disabled;

(c) The restroom fails to maintain at least one ADA accessible ambulatory toilet compartment in operable condition by conforming with the ADA Standards for Accessible Design so that the toilet compartment is arranged for either a left or right hand approach with the required maneuvering clearance maintained around the water closet so that the maneuvering clear floor space around the water closet is not obstructed and consequently rendering the compartment as unusable by the disabled;

(d) The restroom fails to maintain at least one ADA accessible ambulatory toilet compartment in operable condition by conforming with the ADA Standards for Accessible Design so that the side wall grab bar conforms with the ADA Standards

for Accessible Design in all the ways that it is required to be readily accessible to and usable by disabled individuals which includes but is not limited to maintaining a minimum of 1 ½ inches of space between the grab bar and projecting objects below and a minimum of 12 inches of space between the grab bar and projecting objects above;

(e) The restroom fails to maintain at least one ADA accessible ambulatory toilet compartment in operable condition by conforming with the ADA Standards for Accessible Design so that the rear wall grab bar conforms with the ADA Standards for Accessible Design in all the ways that it is required to be readily accessible to and usable by disabled individuals which includes but is not limited to maintaining a 36 inch long grab bar installed so that it is located 12 inches on the closed side of the toilet room and 24 inches on the transfer side and mounted so that the top gripping surface measures 33-36 inches above the finished floor;

(f) The restroom fails to maintain at least one ADA Accessible ambulatory toilet compartment in operable condition by conforming with the ADA Standards for Accessible Design so that the toilet paper dispensers operable parts comply with the applicable standards for accessible design and is otherwise located 7-9 inches from the front of the water closet;

(g) The restroom fails to maintain at least one ADA Accessible ambulatory toilet compartment in operable condition or otherwise configured in away by conforming with the ADA Standards for Accessible Design so that the toilet compartment maintains a toilet compartment door and its associated hardware in an accessible and usable condition by the disabled;

**(20)** Defendants provide a lavatory in the women's restroom near the cashier's area for able-bodied individuals, but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to individuals without disabilities, which includes but is not limited to the following failures of Defendants:

**(a)** The lavatory fails to be maintained in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which has the discriminatory effect of rendering the lavatory sink and its associated elements as unusable by the disabled;

**(b)** There is not at least one ADA accessible lavatory that is maintained in a usable condition so that the top surface of the rim on the lavatory sink measures a maximum of 34 inches above the finished floor and positioned for a forward approach;

**(c)** The clear floor space at the lavatory sink fails to be maintained in conformance with the ADA Standards for Accessible Design so that the knee and toe clearance is not restricting the usability by disabled individuals;

**(d)** There is not at least one lavatory with a mirror that is maintained in a usable condition so that the bottom reflecting surface of the mirror measures a maximum of 40 inches above the finished floor;

**(e)** The paper towel dispenser fails to be maintained in a usable condition so that the dispenser and its operable parts measure the required height for unobstructed and/or obstructed reach ranges and do not require the use of tight grasping, twisting, and/or pinching of the wrist or otherwise restrict the continuous flow of paper;

(21)   Defendants provide cashier's sales and service counters for able-bodied individuals to transact business and otherwise receive services that are provided at each counter but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to other individuals without disabilities, which includes but is not limited to the following failures of Defendants:

(a)   There is not at least one of each type of sales and service counter that is maintained in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which has the discriminatory effects of rendering the counter, its associated elements, and services offered at the counter as unusable by disabled individuals;

(b)   There is not at least one of each type of sales and service counter that is maintained in operable condition by conforming with the ADA Standards for Accessible Design so that the accessible counter and its associated elements are located adjacent to a walking surface complying with 403;

(c)   There is not  at least one of each type of sales and service counter that is maintained in operable condition by conforming with the ADA Standards for Accessible Design so that a portion of the counter surface that is 36 inches long minimum and 36 inches high maximum above the finish floor is readily usable by disabled individuals which includes maintaining a clear floor or ground space complying with 305 positioned for either a parallel approach adjacent to the 36 inch minimum length of counter, or, alternatively, A portion of the counter surface that is 30 inches long minimum and 36 inches high maximum with Knee and toe space complying

with 306 provided under the counter and a clear floor or ground space complying with 305 positioned for a forward approach to the counter;

**(d)** There is not at least one of each type of sales and service counter that is maintained in operable condition with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which includes but is not limited to maintaining the clear counter surface free of obstructions or any other clutter that could have the discriminatory effects of rendering the counter and its associated benefits and services as unusable by the disabled;

**(e)** There is not at least one of each type of sales and service counter that is maintained in operable condition with the ADA Standards for Accessible Design so that accessible counter extends the same depth as the non-accessible portion of the counter;

**(f)** There is not at least one of each type of sales and service counter that is maintained in operable condition with the ADA Standards for Accessible Design so that a credit card payment terminal is positioned or otherwise maintained in a readily accessible to and independently usable location at the accessible counter which has the discriminatory effects in practice of affording disabled individuals an unequal opportunity to independently transact business in the same manner as non-disabled individuals;

**(g)** Defendants fail to maintain the accessible features of the sales and service counter that are required to be readily accessible to and usable by individuals with disabilities;

**(22)** Defendants provide a sales and service counter for able-bodied individuals at the Smiley's restaurant to transact business and otherwise receive services that are provided at each counter but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to other individuals without disabilities, which includes but is not limited to the following failures of Defendants:

**(a)** There is not at least one of each type of sales and service counter that is maintained in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which has the discriminatory effects of rendering the counter, its associated elements, and services offered at the counter as unusable by disabled individuals;

**(b)** There is not at least one of each type of sales and service counter that is maintained in operable condition by conforming with the ADA Standards for Accessible Design so that the accessible counter and its associated elements are located adjacent to a walking surface complying with 403;

**(c)** There is not at least one of each type of sales and service counter that is maintained in operable condition by conforming with the ADA Standards for Accessible Design so that a portion of the counter surface that is 36 inches long minimum and 36 inches high maximum above the finish floor is readily usable by disabled

individuals which includes maintaining a clear floor or ground space complying with 305 positioned for either a parallel approach adjacent to the 36 inch minimum length of counter, or, alternatively, A portion of the counter surface that is 30 inches long minimum and 36 inches high maximum with Knee and toe space complying with 306 provided under the counter and a clear floor or ground space complying with 305 positioned for a forward approach to the counter;

(d) There is not at least one of each type of sales and service counter that is maintained in operable condition with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which includes but is not limited to maintaining the clear counter surface free of obstructions or any other clutter that could have the discriminatory effects of rendering the counter and its associated benefits and services as unusable by the disabled;

(e) There is not at least one of each type of sales and service counter that is maintained in operable condition with the ADA Standards for Accessible Design so that accessible counter extends the same depth as the non-accessible portion of the counter;

(f) Defendants fail to maintain the accessible features of the sales and service counter that are required to be readily accessible to and usable by individuals with disabilities;

(23) Defendants provide several types of dining surfaces disbursed throughout the Smiley's restaurant area for the consumption of food or drink for able-bodied individuals which

includes high-top dining surfaces, but fails to maintain that same level of service to individuals without disabilities, which segregates and relegates individuals with disabilities to inferior benefits of the goods and services provided at Defendants' place of public accommodation which includes but is not limited to the following failures of Defendants:

(a) There is not at least 5% of the seating spaces and standing spaces at the Smiley's restaurant area dining surfaces that are maintained in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which includes but is not limited to the accessible route to the dining surfaces which has the discriminatory effects of rendering the seating spaces and its associated elements as unusable by disabled individuals;

(b) There is not at least 5% of the seating spaces and standing spaces at the Smiley's restaurant area dining surfaces that are maintained in operable condition with the ADA Standards for Accessible Design so that the seating spaces maintain the required t-shaped and/or circular turning clear floor space;

(c) There is not at least 5% of the seating spaces and standing spaces at the Smiley's restaurant area dining surfaces that are maintained in operable condition with the ADA Standards for Accessible Design so that the seating spaces maintain the required 30x48 inches of clear floor space that is positioned for a forward approach to the dining surfaces;

(d) There is not at least 5% of the seating spaces and standing spaces at the Smiley's restaurant area dining surfaces that are maintained in operable condition with the

ADA Standards for Accessible Design so that the tops of the dining surfaces measure 28 inches minimum and 34 inches maximum above the finished which includes the required 30 inches of clear dining surface so that the surface does not prohibit disabled individuals from being equally afforded the opportunity to sit and enjoy the goods and services at the establishment;

(24) Defendants provide self-service counters at Smiley's restaurant for able-bodied individuals to retrieve beverages, condiments, and other items, but fails to provide an ADA accessible self-service counter for disabled individuals in all the ways that are required to be readily accessible to and equally usable by individuals with disabilities, which includes but it not limited to the following failures of Defendants:

(a) There is not at least one of each type of self-service counter that is maintained in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which has the discriminatory effects of rendering the counter, its associated elements, and services offered at the counter as unusable by disabled individuals;

(b) There is not at least one of each type of self-service counter that is maintained in operable condition by conforming with the ADA Standards for Accessible Design so that the accessible counter and its associated elements are located adjacent to a walking surface complying with 403;

(c) There is not  at least one of each type of self-service counter that is maintained in operable condition by conforming with the ADA Standards for Accessible Design so that a portion of the counter surface that is 36 inches long minimum and 36 inches high maximum above the finish floor is readily usable by disabled

individuals which includes maintaining a clear floor or ground space complying with 305 positioned for either a parallel approach adjacent to the 36 inch minimum length of counter, or, alternatively, A portion of the counter surface that is 30 inches long minimum and 36 inches high maximum with Knee and toe space complying with 306 provided under the counter and a clear floor or ground space complying with 305 positioned for a forward approach to the counter;

**(d)** There is not at least one of each type of self-service counter that is maintained in operable condition with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which includes but is not limited to maintaining the clear counter surface free of obstructions or any other clutter that could have the discriminatory effects of rendering the counter and its associated benefits and services as unusable by the disabled;

**(e)** There is not at least one of each type of self-service counter that is maintained in operable condition with the ADA Standards for Accessible Design so that accessible counter extends the same depth as the non-accessible portion of the counter;

**(f)** Defendants fail to maintain the accessible features of the self-service counter that are required to be readily accessible to and usable by individuals with disabilities;

**(25)** Defendants provide a men's restroom near the Magnolia Hill Buffet area for able-bodied individuals, but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or

accommodation that is equal to that experience afforded to other individuals without disabilities, which includes but is not limited to the following failures of Defendants:

**(a)** Defendants maintain signage designating and directing able-bodied individuals to the restrooms but fails to maintain signage conforms to the ADA Standards for Accessible Design so that the international symbol of accessibility is designating and directing disabled individuals to the accessible restroom;

**(b)** There is not at least one toilet compartment that is maintained or otherwise configured in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals including the maneuvering clearance to approach the compartment, clear floor space at the compartment door, and among other associate design requirements which has the discriminatory effects of rendering the restroom and its associated elements as unusable by the disabled;

**(c)** The restroom fails to be maintain at least one ADA accessible toilet compartment in operable condition by conforming with the ADA Standards for Accessible Design so that the toilet compartment is arranged for either a left or right hand approach to the compartment and otherwise maintained in the condition required by the ADA Standards for accessible Design so that the toilet compartment and its associated elements are not rendered unusable by the disabled;

**(d)** The restroom fails to maintain at least one ADA accessible toilet compartment in operable condition by conforming with the ADA Standards for Accessible Design so that the toilet compartment is arranged for either a left or right hand approach with the center line of the water closet located 16-18 inches from the side wall with

the top of the water closet seat surface 17-19 inches above the finished floor and otherwise readily accessible to and usable by disabled individuals;

**(e)** The restroom fails to maintain at least one ADA accessible toilet compartment in operable condition by conforming with the ADA Standards for Accessible Design so that the toilet compartment is arranged for either a left or right hand approach with the required maneuvering clearance maintained around the water closet so that the maneuvering clear floor space around the water closet is not obstructed and consequently rendering the compartment as unusable by the disabled;

**(f)** The restroom fails to maintain at least one ADA accessible toilet compartment in operable condition by conforming with the ADA Standards for Accessible Design so that the rear wall grab bar conforms with the ADA Standards for Accessible Design in all the ways that it is required to be readily accessible to and usable by disabled individuals which includes but is not limited to maintaining a 36 inch long grab bar installed so that it is located 12 inches on the closed side of the toilet room and 24 inches on the transfer side and mounted so that the top gripping surface measures 33-36 inches above the finished floor;

**(g)** The restroom fails to maintain at least one ADA Accessible toilet compartment in operable condition by conforming with the ADA Standards for Accessible Design so that the toilet paper dispensers operable parts comply with the applicable standards for accessible design and is otherwise located 7-9 inches from the front of the water closet;

**(h)** The restroom fails to maintain at least one ADA Accessible toilet compartment in operable condition or otherwise configured in away by conforming with the ADA

Standards for Accessible Design so that the toilet compartment maintains a toilet compartment door and its associated hardware in an accessible and usable condition by the disabled;

**(i)** Defendants fail to maintain the accessible features of the restroom that are required to be readily accessible to and usable by individuals with disabilities;

**(26)** Defendants provide a lavatory in the restroom near the Magnolia Hill Buffet area for able-bodied individuals, but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to individuals without disabilities, which includes but is not limited to the following failures of Defendants:

**(a)** The lavatory fails to be maintained in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which has the discriminatory effect of rendering the lavatory sink and its associated elements as unusable by the disabled;

**(b)** There is not at least one ADA accessible lavatory that is maintained in a usable condition so that the top surface of the rim on the lavatory sink measures a maximum of 34 inches above the finished floor and positioned for a forward approach;

**(c)** There is not at least one ADA accessible lavatory that is maintained in a usable condition so that the water supply and drain pipes under the sink is insulated or otherwise configured to protect against contact;

**(d)** The clear floor space at the lavatory sink fails to be maintained in conformance with the ADA Standards for Accessible Design so that the knee and toe clearance is not restricting the usability by disabled individuals;

**(e)** The paper towel dispenser fails to be maintained in a usable condition so that the dispenser and its operable parts measure the required height for unobstructed and/or obstructed reach ranges and do not require the use of tight grasping, twisting, and/or pinching of the wrist or otherwise restrict the continuous flow of paper;

**(27)** The urinal fails to conform to the ADA Standards for Accessible Design in all the ways that it is required to be readily accessible to and usable by disabled individuals which includes but is not limited to maintaining the urinal so that the top surface of the rim measures 17 inches maximum above the finished floor and flush controls that measure the required height for unobstructed and/or obstructed reach ranges, with 36 inches of clear floor or ground space for a forward approach;

**(28)** Defendants provide a women's restroom near the Magnolia Hill Buffet area for able-bodied individuals, but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to other individuals without disabilities, which includes but is not limited to the following failures of Defendants:

**(a)** Defendants maintain signage designating and directing able-bodied individuals to the restrooms but fails to maintain signage conforms to the ADA Standards for Accessible Design so that the international symbol of accessibility is designating and directing disabled individuals to the accessible restroom;

**(b)** There is not at least one toilet compartment that is maintained or otherwise configured in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals including the maneuvering clearance to approach the compartment, clear floor space at the compartment door, and among other associate design requirements which has the discriminatory effects of rendering the restroom and its associated elements as unusable by the disabled;

**(c)** The restroom fails to be maintain at least one ADA accessible toilet compartment in operable condition by conforming with the ADA Standards for Accessible Design so that the toilet compartment is arranged for either a left or right hand approach to the compartment and otherwise maintained in the condition required by the ADA Standards for accessible Design so that the toilet compartment and its associated elements are not rendered unusable by the disabled;

**(d)** The restroom fails to maintain at least one ADA accessible toilet compartment in operable condition by conforming with the ADA Standards for Accessible Design so that the toilet compartment is arranged for either a left or right hand approach with the center line of the water closet located 16-18 inches from the side wall with the top of the water closet seat surface 17-19 inches above the finished floor and otherwise readily accessible to and usable by disabled individuals;

**(e)** The restroom fails to maintain at least one ADA accessible toilet compartment in operable condition by conforming with the ADA Standards for Accessible Design so that the toilet compartment is arranged for either a left or right hand approach with the required maneuvering clearance maintained around the water closet so that

the maneuvering clear floor space around the water closet is not obstructed and consequently rendering the compartment as unusable by the disabled;

**(f)** The restroom fails to maintain at least one ADA accessible toilet compartment in operable condition by conforming with the ADA Standards for Accessible Design so that the rear wall grab bar conforms with the ADA Standards for Accessible Design in all the ways that it is required to be readily accessible to and usable by disabled individuals which includes but is not limited to maintaining a 36 inch long grab bar installed so that it is located 12 inches on the closed side of the toilet room and 24 inches on the transfer side and mounted so that the top gripping surface measures 33-36 inches above the finished floor;

**(g)** The restroom fails to maintain at least one ADA Accessible toilet compartment in operable condition by conforming with the ADA Standards for Accessible Design so that the toilet paper dispensers operable parts comply with the applicable standards for accessible design and is otherwise located 7-9 inches from the front of the water closet;

**(h)** The restroom fails to maintain at least one ADA Accessible toilet compartment in operable condition or otherwise configured in away by conforming with the ADA Standards for Accessible Design so that the toilet compartment maintains a toilet compartment door and its associated hardware in an accessible and usable condition by the disabled;

**(i)** Defendants fail to maintain the accessible features of the restroom that are required to be readily accessible to and usable by individuals with disabilities;

(29)   Defendants provide a lavatory in the women's restroom near the Magnolia Hill Buffet area for able-bodied individuals, but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to individuals without disabilities, which includes but is not limited to the following failures of Defendants:

(a) The lavatory fails to be maintained in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which has the discriminatory effect of rendering the lavatory sink and its associated elements as unusable by the disabled;

(b) There is not at least one ADA accessible lavatory that is maintained in a usable condition so that the top surface of the rim on the lavatory sink measures a maximum of 34 inches above the finished floor and positioned for a forward approach;

(c) There is not at least one ADA accessible lavatory that is maintained in a usable condition so that the water supply and drain pipes under the sink is insulated or otherwise configured to protect against contact;

(d) The clear floor space at the lavatory sink fails to be maintained in conformance with the ADA Standards for Accessible Design so that the knee and toe clearance is not restricting the usability by disabled individuals;

(e) The paper towel dispenser fails to be maintained in a usable condition so that the dispenser and its operable parts measure the required height for unobstructed and/or

obstructed reach ranges and do not require the use of tight grasping, twisting, and/or pinching of the wrist or otherwise restrict the continuous flow of paper;

(30) Defendants provide a sales and service counter for able-bodied individuals to transact business and otherwise receive services that are provided at Magnolia Hill Buffet, but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to other individuals without disabilities, which includes but is not limited to the following failures of Defendants:

    (a) There is not at least one of each type of sales and service counter that is maintained in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which has the discriminatory effects of rendering the counter, its associated elements, and services offered at the counter as unusable by disabled individuals;

    (b) There is not at least one of each type of sales and service counter that is maintained in operable condition by conforming with the ADA Standards for Accessible Design so that the accessible counter and its associated elements are located adjacent to a walking surface complying with 403;

    (c) There is not at least one of each type of sales and service counter that is maintained in operable condition by conforming with the ADA Standards for Accessible Design so that a portion of the counter surface that is 36 inches long minimum and 36 inches high maximum above the finish floor is readily usable by disabled individuals which includes maintaining a clear floor or ground space complying with 305 positioned for either a parallel approach adjacent to the 36 inch minimum

length of counter, or, alternatively, a portion of the counter surface that is 30 inches long minimum and 36 inches high maximum with knee and toe space complying with 306 provided under the counter and a clear floor or ground space complying with 305 positioned for a forward approach to the counter;

**(d)** There is not at least one of each type of sales and service counter that is maintained in operable condition with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which includes but is not limited to maintaining the clear counter surface free of obstructions or any other clutter that could have the discriminatory effects of rendering the counter and its associated benefits and services as unusable by the disabled;

**(e)** There is not at least one of each type of sales and service counter that is maintained in operable condition with the ADA Standards for Accessible Design so that accessible counter extends the same depth as the non-accessible portion of the counter;

**(f)** Defendants fail to maintain the accessible features of the sales and service counter that are required to be readily accessible to and usable by individuals with disabilities;

**(31)** Defendants provide self-service counters at Magnolia Hill Buffet for able-bodied individuals to retrieve food items, but fails to provide an ADA accessible self-service counter for disabled individuals in all the ways that are required to be readily accessible

to and equally usable by individuals with disabilities, which includes but it not limited to the following failures of Defendants:

**(a)** There is not at least one of each type of self-service counter that is maintained in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which has the discriminatory effects of rendering the counter, its associated elements, and services offered at the counter as unusable by disabled individuals;

**(b)** There is not at least one of each type of self-service counter that is maintained in operable condition by conforming with the ADA Standards for Accessible Design so that the accessible counter and its associated elements are located adjacent to a walking surface complying with 403;

**(c)** There is not  at least one of each type of self-service counter that is maintained in operable condition by conforming with the ADA Standards for Accessible Design so that a portion of the counter surface that is 36 inches long minimum and 36 inches high maximum above the finish floor is readily usable by disabled individuals which includes maintaining a clear floor or ground space complying with 305 positioned for either a parallel approach adjacent to the 36 inch minimum length of counter, or, alternatively, A portion of the counter surface that is 30 inches long minimum and 36 inches high maximum with Knee and toe space complying with 306 provided under the counter and a clear floor or ground space complying with 305 positioned for a forward approach to the counter;

**(d)** There is not at least one of each type of self-service counter that is maintained in operable condition with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which includes but is not limited to maintaining the clear counter surface free of obstructions or any other clutter that could have the discriminatory effects of rendering the counter and its associated benefits and services as unusable by the disabled;

**(e)** There is not at least one of each type of self-service counter that is maintained in operable condition with the ADA Standards for Accessible Design so that accessible counter extends the same depth as the non-accessible portion of the counter;

**(f)** Defendants fail to maintain the accessible features of the self-service counter that are required to be readily accessible to and usable by individuals with disabilities;

**(32)** Defendants provide several types of dining surfaces disbursed throughout the Magnolia Hill Buffet area for the consumption of food or drink for able-bodied individuals including booth dining surface, but fails to maintain that same level of service to individuals without disabilities, which segregates and relegates individuals with disabilities to inferior benefits of the goods and services provided at Defendants' place of public accommodation which includes but is not limited to the following failures of Defendants:

**(a)** There is not at least 5% of the seating spaces and standing spaces at Magnolia Hill Buffet area dining surfaces that are maintained in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which includes but is not limited

to the accessible route to the dining surfaces which has the discriminatory effects of rendering the seating spaces and its associated elements as unusable by disabled individuals;

**(b)** There is not at least 5% of the seating spaces and standing spaces at Magnolia Hill Buffet area dining surfaces that are maintained in operable condition with the ADA Standards for Accessible Design so that the seating spaces maintain the required t-shaped and/or circular turning clear floor space;

**(c)** There is not at least 5% of the seating spaces and standing spaces at Magnolia Hill Buffet area dining surfaces that are maintained in operable condition with the ADA Standards for Accessible Design so that the seating spaces maintain the required 30x48 inches of clear floor space that is positioned for a forward approach to the dining surfaces;

**(d)** There is not at least 5% of the seating spaces and standing spaces at Magnolia Hill Buffet area dining surfaces that are maintained in operable condition with the ADA Standards for Accessible Design so that the tops of the dining surfaces measure 28 inches minimum and 34 inches maximum above the finished which includes the required 30 inches of clear dining surface so that the surface does not prohibit disabled individuals from being equally afforded the opportunity to sit and enjoy the goods and services at the establishment;

**(33)** Defendants provide several types of dining surfaces disbursed throughout the establishment for the consumption of food or drink at the bar area for able-bodied individuals, but fails to maintain that same level of service to individuals without disabilities, which segregates and relegates individuals with disabilities to inferior benefits

of the goods and services provided at Defendants' place of public accommodation which includes but is not limited to the following failures of Defendants:

**(a)** There is not at least 5% of the seating spaces and standing spaces at the bar area dining surfaces that are maintained in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which includes but is not limited to the accessible route to the dining surfaces which has the discriminatory effects of rendering the seating spaces and its associated elements as unusable by disabled individuals;

**(b)** There is not at least 5% of the seating spaces and standing spaces at the bar area dining surfaces that are maintained in operable condition with the ADA Standards for Accessible Design so that the seating spaces maintain the required t-shaped and/or circular turning clear floor space;

**(c)** There is not at least 5% of the seating spaces and standing spaces at the bar area dining surfaces that are maintained in operable condition with the ADA Standards for Accessible Design so that the seating spaces maintain the required 30x48 inches of clear floor space that is positioned for a forward approach to the dining surfaces;

**(d)** There is not at least 5% of the seating spaces and standing spaces at the bar area dining surfaces that are maintained in operable condition with the ADA Standards for Accessible Design so that the tops of the dining surfaces measure 28 inches minimum and 34 inches maximum above the finished which includes the required 30 inches of clear dining surface so that the surface does not prohibit disabled

individuals from being equally afforded the opportunity to sit and enjoy the goods and services at the establishment;

**(e)** Defendants locate casino games on the inaccessible bar counter and consequently denies disabled individuals the opportunity to sit at the bar and play the games which has a discriminatory effect in practice of prohibiting disabled individuals from the full and equal opportunity to use the casino games on the bar counter;

**(f)** Defendants fail to maintain the accessible features at the bar area that are required to be readily accessible to and usable by individuals with disabilities;

**(34)** Defendants provide players club cards for able bodied individuals to enjoy rewards and other benefits at the casino games but fails to provide that same level of service to disabled individuals which includes but is not limited to the following failures of Defendants:

**(a)** The players club card machine requires the use of tight grasping, twisting, and pinching of the wrist;

**(35)** Defendants provide casino games for able bodied individuals but fails to provide that same experience by providing ADA accessible casino games to non-able-bodied individuals, including but not limited to the following failures of Defendants:

**(a)** The casino games do not provide the required clear floor or ground space for an individual with a disability to approach the game;

**(36)** Defendants maintain  routes including means of egress and ingress,  that connects each story and mezzanine in the multi-story establishment for able-bodied individuals but fails to provide an ADA accessible route that connects each story and mezzanine in the multi-story establishment for individuals with disabilities which includes but is not limited to providing a means of access to the second level of the establishment which has the

discriminatory effects of rendering the entire second level of the establishment as unusable by the disabled;

(a) Defendants maintain routes including means of egress and ingress that connects each story and mezzanine in the multi-story establishment for able-bodied individuals but fails to provide an ADA accessible route that coincides with or is located on the same circulation path as the routes and circulations paths that are provided to and used by individuals who are not disabled which has the discriminatory effects of rendering the entire second level of the establishment as unusable by the disabled;

(b) Defendants fail to maintain the accessible route throughout the establishment in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which includes but is not limited to maintaining At least one accessible route that connects the facility entrance with all accessible spaces and elements within the facility which are otherwise connected by a circulation path;

(c) Defendants fail to maintain the elevator in operable condition by conforming with the ADA Standards for Accessible Design so that the second level of the multi-story establishment is not rendered as unusable by the disabled in its entirety;

(d) Defendants fail to maintain the accessible route throughout the establishment in operable condition by conforming with the ADA Standards for Accessible Design so that the required clear walking surfaces and its associated elements are not rendered unusable by the disabled as a result of the display tables, clothing racks, and among other items obstructing the clear floor walking surface;

**(e)** Defendants fail to maintain the accessible route throughout the establishment in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which includes but is not limited to maintaining the accessible routes clear width at turns and/or passing spaces which has the discriminatory effects of rendering the casino aisles, including its goods, as unusable by the disabled;

**(f)** Defendants fail to have or otherwise fails to enforce its policies, practices, or procedures on maintaining in operable working condition the features of the purported accessible route that connects each story and mezzanine in multi-story facilities so that the goods and services are readily accessible to and usable by individuals with disabilities;

**(g)** Defendants have ineffective policies, practices, or procedures that ensures the purported accessible route is readily accessible to and usable by individuals with disabilities so that no individual with a disability is excluded, denied services, segregated, or otherwise treated differently than other individuals without disabilities;

**(37)** Defendants provide a swimming pool for able-bodied individuals but fails to afford non-able-bodied individuals the same opportunity to participate in, or benefit from, a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to other individuals without disabilities which segregates and relegates individuals with disabilities to an inferior benefit;

**(a)** Defendants fail to provide at least two accessible means of entry for an individual with a disability to be afforded the opportunity to get into the pool;

**(b)** Defendants fail to provide a lift which prohibits a wheelchair dependent individual from accessing the pool and enjoying the hotel amenities;

**(c)** Defendants fail to provide 30x48 inches of required clear floor or ground space for a disabled individual to approach the accessible seating by the pool;

**(38)** Defendants provide a fitness center for able-bodied individuals but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to other individuals without disabilities, including but not limited to the following failures of Defendants:

**(a)** Defendants fail to provide at least one type of each exercise machine with the clear floor or ground surface for a wheelchair user to be able to approach the equipment;

**(b)** Defendants fail to maintain an adjacent accessible route to the exercise machines clear floor space which prohibits individuals with disabilities from being afforded the opportunity to maneuver in the fitness room;

**(c)** Defendants fail to maintain the accessible features within the fitness center that are required to be readily accessible to and usable by individuals with disabilities;

**(39)** Defendants fail to provide an accessible route to the seating area around the pool;

**(40)** Defendants provide a poolside seating area for able-bodied individuals but fails to afford non-able-bodied individuals the same opportunity to participate in, or benefit from, a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to other individuals without disabilities which segregates and relegates individuals with disabilities to an inferior benefit, including but not limited to the following failures of Defendants:

**(a)** Defendants fail to provide at least five percent (5%) poolside seating that conforms to the ADA Standards for Accessible Design;

**(b)** There is no ADA accessible poolside seating that conforms to the standards for accessible design in all of the elements that are required to be readily accessible to and usable by individuals with disabilities;

**(c)** Defendants fail to provide poolside seating that is 20 inches deep minimum and 24 inches deep maximum;

**(d)** There is not at least one seat in the poolside seating area that is 17 inches minimum and 19 inches maximum above the finished floor;

**(e)** There is not 36 inches of clear floor or ground space around the poolside seating for a wheelchair user to be able to approach and transfer onto the seating;

**(f)** Defendants position and arranges the poolside seating in a way that makes it nearly impossible for disabled individuals to use the seating which has a discriminatory effect in practice of prohibiting disabled individuals from the full and equal opportunity to use the lounge seating by the pool;

28. To date, the barriers to access and other violations of the ADA still exist and have not been remedied or altered in such a way as to effectuate compliance with the provisions of the ADA.

29. Plaintiffs have been obligated to retain the undersigned counsel for the filing and prosecution of this action. They are entitled to have their reasonable attorney's fees, costs and expenses paid by the Defendants pursuant to 42 U.S.C. §12205.

30. Pursuant to 42 U.S.C. §12188, this Court is vested with the authority to grant

Plaintiffs' injunctive relief, including an Order to alter the discriminating facility to make it readily accessible to, and useable by, individuals with disabilities to the extent required by the ADA, and closing the facility until the requisite modifications are completed, and to further order the Defendants to modify their policies, practices, and procedures, to provide equal use of its facility, services and benefits to disabled individuals.

**COUNT TWO**
**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, TITLE III**
**42 U.S.C. § 12182(b)(2)(A)(ii)**
***(Practices, procedures, and policies denying equal benefits)***

## ADA Title III Prohibits Other Discrimination in Addition to Architectural Barriers

31.    Plaintiffs incorporate by reference and reallege all the paragraphs above.

32.    The ADA, Title III, provides a private right of action for "any person who is being subjected to discrimination on the basis of disability in violation of" Title III. 42 U.S.C. § 12182(a)(1) (emphasis added).

33.    The ADA, Title III, specifically makes it unlawful to provide individuals with disabilities with an "unequal benefit," and to relegate individuals with disabilities to a "different or separate" benefit. 42 U.S.C. §§ 12182(b)(1)(A))(ii)-(iii); 28 C.F.R. § 36.202(b)-(c). In other words, the disabled must receive equal benefits as the nondisabled. Further, 28 C.F.R. § 302(b) requires that goods, services, and accommodations be provided to individuals with disabilities in "the most integrated setting appropriate." 42 U.S.C. § 12182(b)(1)(B); 28 C.F.R. § 36.203(a). Similarly, the Preamble in addition to recognizing that persons who use wheelchairs and mobility aids have been forced to sit apart from family and friends, also recognizes

that persons who use wheelchairs and mobility aids historically have been provided "segregated accommodations" compared to non-disabled individuals, thus relegating persons who use wheelchairs "to the status of second-class citizens." <u>See</u> 28 C.F.R. pt. 36, App. B, at 631-633, 651 (2000) (discussion of §§ 36.308, 36.203).

34.  Congress enacted the ADA in light of its findings that "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities."  42 U.S.C. § 12101(a)(5).

35.  To address this broad range of discrimination in the context of public accommodations, Congress enacted ADA, Title III, which provides in part: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. 12182.

36.  By its clear text, ADA, Title III requires a public accommodation to provide individuals with disabilities *more than simple physical access.* Removal of architectural barriers as required by Count One of this Complaint is but one component of compliance with ADA, Title III. Congress recognized that "individuals with disabilities continually encounter various forms of

discrimination" including not only barriers to physical access, but also other forms of exclusion and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities. 42 U.S.C. 12101(a)(5); see also H.R. Rep. No. 485, Pt. 2, 101st Cong., 2d Sess. 35-36 (1990) ("lack of physical access to facilities" was only one of several "major areas of discrimination that need to be addressed"); H.R. Rep. No. 485, Pt. 3, 101st Cong., 2d Sess. 54 (1990) ("It is not sufficient to only make facilities accessible and usable; this title prohibits, as well, discrimination in the provision of programs and activities conducted by the public accommodation.").

37. For that reason, the Act applies not only to barriers to physical access to places of public accommodation, but also to any policy, practice, or procedure that operates to deprive or diminish disabled individuals' full and equal enjoyment of the privileges and services offered by the public accommodation to the public. 42 U.S.C. § 12182. Thus, a public accommodation may not have a policy, practice or procedure that excludes individuals with disabilities from services. 42 U.S.C. § 12182(b)(2)(A)(ii). The Eleventh Circuit held in <u>Rendon v. Valleycrest Prod., Ltd.</u> 294 F.3d 1279, (11th Cir. 2002) that:

> *"A reading of the plain and unambiguous statutory language at issue reveals that the definition of discrimination provided in Title III covers both <u>tangible barriers</u> (emphasis added), that is, physical and architectural barriers that would prevent a disabled person from entering an accommodation's facilities and accessing its goods, services and privileges, see 42 U.S.C. § 12182(b)(2)(A)(iv), and <u>intangible barriers</u> (emphasis added), such as eligibility requirements and screening rules or discriminatory policies and procedures that restrict a disabled person's ability to enjoy the Defendants entity's goods, services and*

*privileges."*

**Defendants' Failed Practices and Lack of Policies Are Discriminatory**

38.     Pursuant to 42 U.S.C. § 12182(b)(2)(A)(ii) discrimination includes:

> "*a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations*."

39.     Accordingly, a place of public accommodation must modify a policy or practice that has the consequence of, or tends to deny, access to goods or services to the disabled. Similarly, a place of public accommodation must not have a policy or practice that "*has a discriminatory effect in practice*" of preventing disabled individuals from realizing the full and equal enjoyment of the goods and services the public accommodation offers to potential customers. *Nat'l Fed'n of the Blind v. Scribd Inc.*, 97 F.Supp.3d 565 (D. Vt. 2015).

40.     As detailed below, Defendants failed to make reasonable modifications in their policies, practices, and procedures that are necessary to afford its goods, services, facilities, privileges, advantages, or accommodations to individuals with restricted mobility. By failing to take such efforts that may be necessary to ensure that no individual with a disability is excluded, Defendants denied services, segregated or otherwise treated Plaintiff differently than other individuals who are not disabled. Pursuant to 42 U.S.C. § 12182(b)(2)(A), Defendants have discriminated against

Plaintiffs. Defendants will continue that discrimination forever until enjoined as Plaintiffs request. The discrimination is described more particularly in the following paragraphs.

41. Defendants either have no policies, practices, and procedures to remove architectural barriers or else do not abide by them. The rampant architectural barriers previously identified in Count One establish that Defendants have failed to create, adopt, and/or implement ADA Title III compliance policies, procedures, and practices as to architectural barriers.

42. Defendants' use of their establishment, and their practices at Riverwalk Casino located at 1046 Warrenton Rd, Vicksburg, MS 39180 literally create barriers and in so doing deny Plaintiff the full and equal enjoyment of the establishment. Those practices include:

   (1) Defendants fail to provide ADA accessible parking with connecting accessible routes to the establishment from its parking area, which means that Plaintiffs are forced to depend on assistance from a third party to get into Riverwalk, whereas non-disabled conveniently access the establishment from the parking area;

   (2) Defendants make the outdoor seating benches inaccessible for use by the disabled by failing to provide seating that conforms to the ADA Standards for Accessible Design, which means Plaintiffs are denied the opportunity to fully and equally use the seating to sit and relax while waiting, whereas non-disabled individuals are able to utilize the outdoor seating bench;

(3) Defendants make the sales and service counter inaccessible for use by the disabled by failing to provide either a parallel or a forward approach to the counter, which means Plaintiffs cannot fully and equally use the counter to check into their hotel rooms/suites at Riverwalk in the way the non-disabled do, because the non-disabled have a counter they can use to check into their hotel rooms/suites at Riverwalk;

(4) Defendants make the sales and service counter at gift shop inaccessible for use by the disabled by failing to provide either a parallel or a forward approach to the counter, which means Plaintiffs cannot fully and equally use the counter to transact business in the way the non-disabled do, because the non-disabled have a counter they can use to transact business;

(5) Defendants fail to provide hotel suites to disabled individuals, which means Plaintiffs are forced to be segregated to inferior services and rooms, whereas non-disabled are able to reserve the hotel suites and enjoy the luxury features of the suites;

(6) Defendants fail to provide an accessible reservation system for disabled individuals, which means that Plaintiffs are segregated, separated and otherwise screened out from being able to reserve a hotel suite, whereas non-disabled individuals are able to make reservations;

(7) Defendants fail to provide a description of the accessible features of the establishment for disabled individuals, which means Plaintiffs cannot fully and equally evaluate the features of the Riverwalk in the same way the non-disabled do, because the non-disabled are able to independently use the

website to evaluate the features of the hotel;

**(8)** Defendants fail to provide a description of the accessible features of the hotel suites for disabled individuals;

**(9)** Defendants fail to provide a policy to guarantee rooms that disabled individuals reserve;

**(10)** Defendants fail to provide an accessible route to and throughout the establishment that is accessible to the disabled, which means that Plaintiffs cannot travel and move into or throughout the establishment in the way non-disabled people can. Accordingly, they cannot fully and equally use and access Riverwalk and all of its goods and services as the non-disabled can;

**(11)** Defendants make the indoor lounge seating inaccessible for use by the disabled by failing to provide seating that conforms to the ADA Standards for Accessible Design, which means Plaintiff is denied the opportunity to fully and equally use the seating to sit and relax while waiting, whereas non-disabled individuals are able to utilize the indoor seating;

**(12)** Defendants fail to provide an accessible fitness center to disabled individuals, which means Plaintiffs cannot fully and equally use the fitness center in the same way the non-disabled do, because the non-disabled have a fitness center they can use independently;

**(13)** Defendants make the cashier's sales and service counter inaccessible for use by the disabled by failing to provide either a parallel or a forward approach to the counter, which means Plaintiffs cannot fully and equally use the counter to transact business in the way the non-disabled do, because

the non-disabled have a counter they can use to transact business;

**(14)** Defendants make the sales and service counter at Smiley's inaccessible for use by the disabled by failing to provide either a parallel or a forward approach to the counter, which means Plaintiffs cannot fully and equally use the counter to transact business in the way the non-disabled do, because the non-disabled have a counter they can use to transact business;

**(15)** Defendants' seating arrangement serving Smiley's is designed, positioned, and oriented in a way that excludes or otherwise segregates disabled individuals to an experience that is not the same experience that is afforded to able-bodied individuals, because unlike the able-bodied, disabled individuals are forced to sit at one type of table or facing the wall, or are outright excluded from the "opportunity" to sit anywhere else that able-bodied individuals are able to sit and enjoy the Riverwalk experience;

**(16)** Defendants' use of the seating arrangement serving Smiley's has a discriminatory effect in practice, so that Plaintiffs are provided a "separate" and "unequal" benefit than the benefits that able-bodied individuals have when at Smiley's because able-bodied individuals can sit at every type of seating table, whereas Plaintiffs are entirely prohibited from that same "opportunity" to considering where they want to sit;

**(17)** Defendants make the self-service counters throughout the Smiley's restaurant inaccessible for use by the disabled by failing to provide either a parallel or a forward approach to the counters with the required clear counter surface at the required accessible height, and failing to arrange the

items on the self-service counters in a way that the disabled can independently access the items, which means Plaintiffs cannot fully and equally use the self-service counters to select their food or put toppings or condiments on their food choices in the same way the non-disabled do, because the non-disabled have self-service counters they can use independently;

**(18)** Defendants make the sales and service counter at the Magnolia's Hill Buffet inaccessible for use by the disabled by failing to provide either a parallel or a forward approach to the counter, which means Plaintiffs cannot fully and equally use the counter to pay for the buffet in the way the non-disabled do, because the non-disabled have a counter they can use to pay for the buffet;

**(19)** Defendants make the self-service counters throughout the Magnolia's Hill Buffet inaccessible for use by the disabled by failing to provide either a parallel or a forward approach to the counters with the required clear counter surface at the required accessible height, and failing to arrange the items on the self-service counters in a way that the disabled can independently access the items, which means Plaintiffs cannot fully and equally use the self-service counters to select their food or put toppings or condiments on their food choices in the same way the non-disabled do, because the non-disabled have self-service counters they can use independently;

**(20)** Defendants' seating arrangement serving the Magnolia's Hill Buffet is designed, positioned, and oriented in a way that excludes or otherwise

segregates disabled individuals to an experience that is not the same experience that is afforded to able-bodied individuals, because unlike the able-bodied, disabled individuals are forced to sit at one type of table or facing the wall, or are outright excluded from the "opportunity" to sit anywhere else that able-bodied individuals are able to sit and enjoy the Riverwalk experience;

(21) Defendants' use of the seating arrangement serving the Magnolia's Hill Buffet has a discriminatory effect in practice, so that Plaintiffs are provided a "separate" and "unequal" benefit than the benefits that able-bodied individuals have when at the Magnolia's Hill Buffet because able-bodied individuals can sit at every type of seating table, whereas Plaintiffs are entirely prohibited from that same "opportunity" to considering where they want to sit;

(22) Defendants' seating arrangement serving the bar area is designed, positioned, and oriented in a way that excludes or otherwise segregates disabled individuals to an experience that is not the same experience that is afforded to able-bodied individuals, because unlike the able-bodied, disabled individuals are forced to sit at one type of table or facing the wall, or are outright excluded from the "opportunity" to sit anywhere else that able-bodied individuals are able to sit and enjoy the Riverwalk experience;

(23) Defendants make the bar and its associated benefits inaccessible for use by the disabled, which means that Plaintiffs are entirely prohibited from being afforded the opportunity to approach the bar counter to order a drink, or sit

at the bar to socialize, or any other benefits that able-bodied individuals receive at the bar;

**(24)** Defendants make their toilet facilities throughout the establishment inaccessible for use by the disabled by failing to maintain any ADA accessible elements within the restrooms so that Plaintiffs are afforded the opportunity to independently use the restroom, or clean up, or move into and throughout the restroom, whereas non-disabled individuals are able to independently use the restrooms;

**(25)** Defendants fail to provide a place for the disabled both to sit and eat like able-bodied people can;

**(26)** Defendants make their casino games inaccessible for use by the disabled by failing to maintain the ADA accessible features whatsoever so that Plaintiffs are excluded from being able to approach the games, whereas, non-disabled individuals are able to independently use all the casino games;

**(27)** Defendants fail to provide an accessible cashier and players club counter to the disabled which means Plaintiffs cannot fully and equally use the counter to transact business in the same way the non-disabled do, because the non-disabled have a counter they can use independently;

**(28)** Defendants fail to provide an accessible route that connects the hotel to all of the spaces and elements of the outdoor pool area that are required to be readily accessible to and usable by disabled individuals, so that Plaintiffs are entirely prohibited from accessing each and every space and element of the outdoor pool area, and are therefore prohibited from enjoying the same

benefits and experiences in the same way as the non-disabled get to enjoy;

(29) Defendants' seating arrangement and its failure to provide accessible lounge seating at the pool are designed, positioned, and oriented in a way that excludes or otherwise segregates disabled individuals to an experience that is not the same experience that is afforded to able-bodied individuals, because unlike able bodied individuals, disabled individuals are outright excluded from the "opportunity" to sit and lounge by the pool to enjoy the view or soak up the sun or any other relaxing benefit from anywhere else that able-bodied individuals are able to sit and enjoy the lounge seating by the pool;

(30) Defendants fail to provide an accessible route to the lounge seating by pool that is readily accessible to and usable by disabled individuals, so that Plaintiffs are entirely prohibited from accessing each and every space and element of the lounge seating by the pool, and are therefore prohibited from enjoying the same benefits and experiences the non-disabled get to enjoy;

(31) Defendants fail to provide a description of the accessible features of Riverwalk for disabled individuals, which means Plaintiffs cannot fully and equally evaluate the features of Riverwalk in the same way the non-disabled do, because the non-disabled are able to independently use the website to evaluate the features of Riverwalk;

(32) Defendants fail to provide a mobile web platform that enables voice recognition software and other assistive touch technologies for disabled individuals to receive the same services through the mobile app as non-

disabled individuals do;

**(33)** Defendants' policies, practices, and procedures are conducted without regard to disabled individuals;

43.   As the continuing architectural barriers and the failure to provide full and equal use of the facility establishes, the Defendants have no policies, practices, or procedures, or else they have failed to implement them, to ensure that any removal of architectural barriers is permanent. 42 U.S.C. § 12182(b)(2)(a)(iv) and (v).

44.   As the continuing architectural barriers and the failure to provide full and equal use of the facility establishes, Defendants' existing practice is both in effect and/or explicitly to remediate ADA Title III architectural barriers only upon demand by the disabled.

45.   As the continuing architectural barriers and the failure to provide full and equal use of the facility establishes, Defendants have no policies, practices, and procedures or else they failed to create, implement and maintain policies and procedures to ensure individuals with disabilities are able to have the same experience at Riverwalk as individuals without disabilities, 42 U.S.C. 12182(b)(1)(A), and in particular the opportunity to have full and equal access to all of the goods, services, privileges, advantages, or accommodations of the Riverwalk establishment, as described above in detail.

46.   As the continuing architectural barriers and the failure to provide full and equal use of the facility establishes, Defendants have failed to create, implement, and maintain a policy of complying with ADA building design standards and regulations.

**47.**   To date, the Defendants' discriminating policies, practices, and/or procedures have not been reasonably modified to afford goods, services, facilities, privileges, advantages, or other accommodations to individuals with disabilities.

**48.**   A reasonable modification in the policies, practices, and procedures described above will not fundamentally alter the nature of such goods, services, facilities, privileges, advantages, and accommodations. The Plaintiffs hereby demand that Defendants both create and adopt a corporate practice and policy that Defendants (1) will fully comply with Title III, ADA, and all its implementing regulations so that physical and non-physical barriers identified above are permanently removed from Defendants' casino and hotel consistent with the ADA; (2) Defendants will provide the disabled, including those with mobility limitations full and equal use and enjoyment of Riverwalk; (3) Riverwalk will remedy its practice of making ADA Title III remediations only upon demand by the disabled (4) Riverwalk will remedy its practice of screening out disabled individuals through the use of its reservation system; (5) Riverwalk will remedy its practice of screening out disabled individuals through the use of its phone reservation system; (6) Riverwalk will remedy its practice of not guaranteeing Plaintiffs and others similar situated the accessible room they requested.

**49.**   The ADA is over twenty-five (25) years old. Defendants know they must comply with the ADA Title III. The ADA Title III requires modifications in policies, practices, and procedures to comply with it, as pled above in the statute. 42 U.S.C. §12182(b)(2)(A)(ii).

50.    By this Complaint, Plaintiffs provide sufficient notice of their demands for an alteration in Defendants' policies, practices, and procedures.

51.    Plaintiffs have been obligated to retain the undersigned counsel for the filing and prosecution of this action. They are entitled to have their reasonable attorney's fees, costs and expenses paid by the Defendants pursuant to 42 U.S.C. § 12205.

52.    Pursuant to 42 U.S.C. § 12188 this Court is authorized to enjoin these illegal policies, practices, and procedures.

### COUNT THREE
### VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
#### *(Denial of Full and Equal Enjoyment)*

53.    Plaintiffs incorporate by reference and reallege all the paragraphs above.

54.    42 U.S.C. § 12182(a) provides:

> *"No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."*

55.    Congress enacted the ADA upon finding, among other things, that "society has tended to isolate and segregate individuals with disabilities" and that such forms for discrimination continue to be a "serious and pervasive social problem." 42 U.S.C. § 12101(a)(2).

56.    Congress also found that: "*individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication*

*barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities,* 42 U.S.C. § 12101(a)(5); "*the nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals;*" 42 U.S.C. § 12101(a)(7). Congress even found that: "*the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous, and costs the United States billions of dollars in unnecessary expenses resulting from dependency and nonproductivity.*" 42 U.S.C. § 12101(a)(8).

57. In response to these findings, Congress explicitly stated that the purpose of the ADA is to provide "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and "clear, strong, consistent, enforceable standards addressed discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1)-(2).

58. The ADA provides, inter alia, that it is discriminatory to subject an individual or class of individuals on the basis of a disability "to a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity." 42 U.S.C. § 12182(a)(i).

59. The ADA further provides that it is discriminatory "to afford an individual or class of individuals, on the basis of a disability ... with the opportunity to participate in

or benefit from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded to other individuals." 42 U.S.C. § 12182(a)(ii).

60.  Congress enacted the ADA in light of its findings that "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities." 42 U.S.C. 12101(a)(5). Defendants' acts and omissions alleged herein are in violation of the ADA, 42 U.S.C. §§ 12101, et seq., and the regulations promulgated thereunder.

61.  To address this *broad* range of discrimination in the context of public accommodations, Congress enacted Title III, which by its clear text, requires a public accommodation to provide individuals with disabilities more than simple physical access. Congress recognized that "individuals with disabilities continually encounter *various forms of discrimination"* including not only barriers to physical access, but also other forms of exclusion and *relegation to lesser services, programs, activities, benefits, jobs, or other opportunities*. 42 U.S.C. 12101(a)(5); see also H.R. Rep. No. 485, Pt. 2, 101st Cong., 2d Sess. 35-36 (1990) ("lack of physical access to facilities" was only one of several "major areas of discrimination that need to be addressed"); H.R. Rep. No. 485, Pt. 3, 101st Cong., 2d Sess. 54 (1990) ("It is not sufficient to only make facilities accessible and usable; this title prohibits, as well, discrimination in the provision of programs and activities

conducted by the public accommodation.").

62.  For that reason, the Act applies not only to barriers to physical access to business locations, but also to any policy, practice, or procedure that operates to deprive or diminish disabled individuals' *full and equal enjoyment* of the privileges and *services* offered by the public accommodation to the public. 42 U.S.C. 12182. Thus, a public accommodation may not have a policy, practice or procedure that excludes individuals with disabilities from services. 42 U.S.C. § 12182(b)(1)(A)(i).

63.  The keystone for this analysis is Defendants *must start by considering how their facilities are used by non-disabled guests and then take reasonable steps to provide disabled guests with a like experience. Spector v.  Norwegian Cruise Line Ltd.,* 545 U.S. 119, 128–29, 125 S.Ct. 2169, 162 L . E d . 2d 97 (2005) See also, *Baughman v.  Walt Disney World Company*, 685 F.3D 1131, 1135 (9th Cir. 2012).

64.  Plaintiffs, Hope Elly and John Smith were denied full and equal access to Riverwalk. Plaintiffs specifically and definitely want to return to the Defendants' establishment to enjoy the Riverwalk Casino Hotel experience. More specifically, Plaintiffs want to be afforded the same level of service that is offered to non-disabled individuals and which Defendants have failed to provide to Plaintiffs as follows: Defendants failed to provide Plaintiffs the same opportunity to independently participate in and enjoy the hospitality, views of the Mississippi River, 80 hotel rooms, including suites and some of the best southern hospitality dining and variety gaming entertainment experience Riverwalk is known for; Defendants failed to provide accessible parking and accessible routes into Riverwalk for disabled individuals, which means Plaintiffs cannot park, cannot

independently get out of their cars and onto their wheelchairs, cannot independently travel from the parking area into Riverwalk, cannot determine if there is a usable parking space, and must determine by trial and error how they are to park and move into Riverwalk; Defendants failed to provide an accessible route to and throughout the establishment for disabled individuals, which means Plaintiffs cannot independently travel into and move throughout the establishment; Defendants failed to provide Plaintiffs the same experience by Riverwalk's ablest use of its seating arrangements throughout the establishment that are designed, positioned and orientated in a way that excludes or otherwise segregates disabled individuals to an experience that is not the same experience that is afforded to able-bodied individuals, because unlike able bodied individuals, disabled individuals are forced to sit at one type of table or facing the wall, or otherwise outright excluded from the "opportunity" to sit anywhere else that able-bodied individuals are able to sit and enjoy the Riverwalk experience; Defendants failed to provide Plaintiffs and other disabled individuals the required maneuvering clearance and clear floor space in almost every way possible, which means that the disabled cannot travel and move throughout Riverwalk on the same paths of travel that non-disabled individuals use to travel throughout Riverwalk; Defendants failed to provide Plaintiffs the same opportunity to participate in and enjoy the benefits of the players club, including but not limited to earning rewards that convert to slot credits, earning benefits at the players tables, earning valuable "comp" dollars that can be redeemed at the restaurants, receiving monthly deals for Riverwalk in the mail, among other benefits of the players club; Defendants failed to provide Plaintiffs

that same experience that non-disabled individuals have when sitting and enjoying their food and drinks at the Smiley's area by failing to provide access to the dining tables and seating at Smiley's; Defendants failed to provide Plaintiffs that same experience when eating at Smiley's by making it nearly impossible for the disabled to access the self-service counters, although the non-disabled can access the self-service counters independently; Defendants failed to provide the same experience by making it nearly impossible for the disabled to access the cashier sales and service counter at Riverwalk, while the non-disabled can fully and independently access the counter and the plethora of services provided at the counter; Defendants failed to provide Plaintiffs that same experience that non-disabled individuals have when at Riverwalk; Defendants failed to provide the same experience to Plaintiffs by making it nearly impossible for the disabled to access the seating throughout Riverwalk, while the non-disabled can independently access and use the seating throughout Riverwalk to their leisure and convenience; Defendants failed to provide an accessible route that connects the casino to all of the spaces and accessible elements throughout the establishment for disabled individuals, which means that unlike the non-disabled, the disabled must struggle to get throughout establishment independently, if they can make it at all; Defendants failed to provide Plaintiffs that same experience that non-disabled individuals have when dining at the Magnolia's Hill Buffet; Defendants failed to provide the same experience by making it nearly impossible for the disabled to access the sales and service counter at Magnolia's Hill Buffet, while the non-disabled can independently access the counter and services provided at the counter; Defendants failed to provide Plaintiffs

that same experience that non-disabled individuals have when sitting and enjoying their food and drinks at Magnolia's Hill Buffet by failing to provide access to the dining tables and seating in Magnolia's Hill Buffet; Defendants failed to provide Plaintiffs that same experience when eating at Magnolia's Hill Buffet by making it nearly impossible for the disabled to access the food selection counters, although the non-disabled can access the food selection counters independently; Defendants failed to provide Plaintiffs that same experience that non-disabled individuals have when enjoying drinks and games at the bar by failing to provide access to the seating at the bar; Defendants failed to provide accessible restrooms throughout Riverwalk for disabled individuals, which means that, unlike the able-bodied, the disabled are challenged or denied the opportunity to independently use the restrooms, clean up after using the restrooms, move throughout the restrooms, and use the other elements of the restrooms; Defendants failed to provide the same experience by making it nearly impossible for the disabled to access the sales and service counters throughout the establishment, though the able-bodied can fully use and enjoy all the sales and service counters throughout Riverwalk; Defendants failed to provide Plaintiffs that same experience that non-disabled individuals have when dining at the restaurants and bars throughout Riverwalk by failing to provide access to dining tables and seating, which the non-disabled are able to access freely; Defendants failed to provide the same experience by making it nearly impossible for the disabled to access the outdoor seating benches, while the non-disabled can independently access the seating; Defendants failed to provide the same experience by making it nearly impossible for the disabled to access the indoor lounge seating,

while the non-disabled can independently access the seating; Defendants failed to provide the same experience by making it nearly impossible for the disabled to access the sales/service counter at the hotel area, while the non-disabled can independently access the counter and services provided at the counter; Defendants failed to provide the same experience by making it nearly impossible for the disabled to access the sales and service counter at the gift shop, while the non-disabled can independently access the counter and services provided at the counter; Defendants failed to provide the same experience to Plaintiffs by failing to provide accessible lounge seating by the pool, which means that Plaintiffs and other disabled individuals are denied the opportunity to sit outside by the pool and relax, lounge and enjoy the outdoors in the same way the non-disabled do; Defendants failed to provide Plaintiffs that same experience by designing, positioning and orienting their seating arrangements in the lounge seating area by the pool in a way that excludes and segregates disabled individuals of the same experience that non-disabled individuals have when lounging in the lounge seating area by the pool because unlike the non-disabled, disabled individuals are outright excluded from the opportunity to sit outside by the pool and relax, lounge and enjoy the outdoors from the same areas and in the same ways that non-disabled individuals are able to sit and enjoy it; Defendants failed to provide Plaintiffs that same experience that non-disabled individuals have when at the pool area; Defendants failed to provide an accessible route that connects the hotel to all of the spaces and elements of the pool area for disabled individuals, which means that Plaintiffs and other disabled individuals are entirely prohibited from accessing each and every space and

element of the pool area, and are therefore prohibited from enjoying the pool area in the same way that the non-disabled area able to enjoy it; Defendants failed to provide Plaintiffs and other disabled individuals the same experience that the non-disabled have when at the pool area by failing to maintain any ADA accessible features whatsoever, which means that unlike the non-disabled, the disabled are completely excluded from the opportunity to lounge in the pool chairs, swim in the pool, among other services at the pool, all of which the non-disabled have the opportunity to independently use and enjoy; Defendants failed to provide Plaintiffs that same experience by failing to provide an accessible fitness center for the disabled, while the non-disabled can fully access the fitness center; Defendants failed to provide Plaintiffs that same experience that non-disabled individuals have when playing games in the casino by failing to provide the required clear floor or ground space; Defendants failed to provide Plaintiffs that same online experience non-disabled individuals have; Defendants failed to provide Plaintiffs the same experience by failing to provide a description of the accessible features of Riverwalk on their website, which means Plaintiffs cannot fully and equally evaluate the features of Riverwalk to determine what features, if any, are accessible to and usable by disabled individuals, while the non-disabled are able to independently use the website to evaluate all of the non-accessible features of Riverwalk provided to them; Defendants failed to provide Plaintiffs the same experience by failing to provide a mobile application service that allows the disabled to view all of the accessibility features at Riverwalk to determine what features, if any, are accessible to and usable by disabled individuals, while the non-

disabled are able to independently use the mobile application to view and evaluate all of the non-accessible features of Riverwalk provided to them; Defendants failed to provide Plaintiffs the same experience by failing to modify its website and mobile application services to allow assistive technology for the disabled, which includes but is not limited to voice recognition, alternative input methods, and assistive touch functions, among other accessibility methods that Plaintiffs and other disabled individuals require in order to use mobile applications and their associated features in the same, equal way that non-disabled individuals are able to use them; Defendants' continued failure to maintain ADA accessibility as an integral part of the Riverwalk atmosphere and experience that non-disabled individuals get to independently enjoy has segregated or otherwise treated Plaintiffs and others similarly situated differently, in that, Riverwalk makes Plaintiffs dependent on family or an independent third party which is not the same experience that Riverwalk affords to non-disabled individuals; Defendants failed to maintain the accessible features of Riverwalk that are required to be readily accessible to and usable by Plaintiffs and others similarly situated, such as the maintaining the accessible routes to enter and travel throughout the establishment; Defendants denied Plaintiffs the full and equal enjoyment of Riverwalk; and all the foregoing failures by Defendants inhibited Plaintiffs from having the same experience that non-disabled individuals have when at the Riverwalk establishment.

65.   In its Preamble to the title III regulation, the Department of Justice recognized that mobility impaired persons including persons in wheelchairs should have the same opportunities to enjoy the goods and services and other similar events of public

accommodation with their families and friends, just as other non-disabled individuals do. The DOJ further recognized that providing segregated accommodations and services relegates persons with disabilities to the status of *second-class citizens*. 28 C.F.R. pt. 36, App. B, § 36.203.

66.    The ADA specifically makes it unlawful to provide individuals with disabilities with an "unequal benefit," and to relegate individuals with disabilities to a "different or separate" benefit. 42 U.S.C. §§ 12182(b)(1)(A)(ii)-(iii); 28 C.F.R. § 36.202(b)-(c). Further, 28 C.F.R. § 302(b) require that goods, services, and accommodations be provided to individuals with disabilities in "the most integrated setting appropriate." 42 U.S.C. § 12182(b)(1)(B); 28 C.F.R. § 36.203(a). Similarly, the Preamble in addition to recognizing that persons who use wheelchairs have been forced to sit apart from family and friends, also recognizes that persons who use wheelchairs historically have been provided "inferior seating" and "segregated accommodations" compared to non-disabled individuals, thus relegating persons who use wheelchairs "to the status of second-class citizens." See 28 C.F.R. pt. 36, App. B, at 631-633, 651 (2000) (discussion of §§ 36.308, 36.203).

67.    Thus, Defendants' "use" of the accessible features constitutes statutory discrimination in violation of the ADA, because Defendants have segregated and separated the disabled from the non- disabled individuals. "*The goal is to eradicate the invisibility of the handicapped. Separate-but-equal services do not accomplish this central goal and should be rejected.*" *H.R. Rep. No. 101-485(III), at 50, 1990 U.S.C.C.A.N at 473.* The ADA provides a "broad mandate" to "eliminate discrimination against disabled individuals, and to integrate those individuals into

the economic and social mainstream American life. *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675, 121 S.Ct.1879, 149 L.Ed.2d 904 (2001) (*quoting H.R.Rep. No. 101-485, pt. 2, p.50 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 332*).

68.   Defendants discriminated against Plaintiffs by denying Plaintiffs "full and equal enjoyment" and use of the goods, services, facilities, privileges and accommodations of the facility during each visit. Each incident of deterrence denied Plaintiffs an equal "opportunity to participate in or benefit from the goods, services, facility, privilege, advantage, or accommodations" of Riverwalk.

69.   Defendants' conduct and Defendants' unequal treatment to Plaintiffs constitutes continuous violations of the ADA and absent a Court ordered injunction from doing so, the Defendants will continue to treat Plaintiffs and others similarly situated unequally to the status of a second-class citizen.

70.   Defendants' failure to maintain the accessible features that are required to be readily accessible to and usable by individuals with disabilities constitute continuous discrimination and absent a Court ordered injunction, Defendants will continue to not maintain the required accessible features at Defendants' facility. 28 C.F.R.§ 36.211(a).

71.   Plaintiffs have been obligated to retain the undersigned counsel for the filing and prosecution of this action. They are entitled to have their reasonable attorney's fees, costs and expenses paid by the Defendants pursuant to 42 U.S.C. § 12205.

72.   Pursuant to 42 U.S.C. § 12188, this Court is authorized to enjoin these illegal acts of Defendants.

**COUNT FOUR**
**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, TITLE III**
**42 U.S.C. § 12183(a)(1)**
*(Failure to design and construct facility for ADA compliance)*

**73.** Plaintiffs incorporate by reference and reallege all the paragraphs above.

**74.** 42 U.S.C. § 12183(a)(1) provides:

> *[Discrimination includes] a failure to design and construct facilities for first occupancy later than 30 months after July 26, 1990, that are readily accessible to and usable by individuals with disabilities, except where an entity can demonstrate that it is structurally impracticable to meet the requirements of such subsection in accordance with standards set forth or incorporated by reference in regulations issued under this subchapter.*

**75.** Congress passed the ADA in part because "historically, society has tended to isolate and segregate individuals with disabilities, and such forms of discrimination ... continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2). Congress found that this discrimination included "segregation and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities." Id. § 12101(a)(5). In its Preamble to the title III regulation, the Department of Justice recognized that persons in wheelchairs should have the same opportunities to enjoy the goods and services and other similar events of a public accommodation with their families and friends, just as other non-disabled individuals do. The DOJ further recognized that providing segregated accommodations and services relegates persons with disabilities to the status of *second-class citizens*. 28 C.F.R. pt. 36, App. B, § 36.203.

76. To eliminate such segregation Congress enacted the requirement that facilities be "readily accessible to and usable by individuals with disabilities". This very requirement is intended to enable persons with disabilities "*to get to, enter and use a facility*." H.R. Rep. No. 101- 485(III), at 499-500 (1990). It requires "a high degree of convenient accessibility," id., as well as access to the same services that are provided to members of the general public. "For new construction and alterations, the purpose is *to ensure that the service offered to persons with disabilities is equal to the service offered to others*." *Id*.

77. As the legislative history makes clear, the ADA is geared to the future-- the goal being that, over time, access will be the rule rather than the exception. Thus, the ADA only requires modest expenditures to provide access in existing facilities, *while requiring all new construction to be accessible.* H.R. Rep. 485, Part 3, 101st Cong., 2d Sess. 63 (1990).

78. To realize its goal of a fully accessible future, Congress required that all newly constructed facilities be designed and constructed according to architectural standards set by the Attorney General. 42 U.S.C. §§ 12183(a), 12186(b). Those Standards for Accessible Design ("Standards") are incorporated into the Department of Justice's regulation implementing title III of the ADA, 28 C.F.R. Part 36, Appendix A. The Standards set architectural requirements for newly constructed buildings that apply to all areas of the facility, from parking areas, interior walkways and entrances, common areas, interior stairways and elevators, restrooms, dressing rooms and sales/service areas.

**79.** Defendant, Magnolia Hill, LLC, "owns" and "operates" the real property and its improvements in which Riverwalk is located and is directly involved in the designing and/or construction of the casino in this litigation for first occupancy after January 1993.

**80.** Defendants were and are required to design and construct Riverwalk to be "readily accessible to and usable by individuals with disabilities." Defendants violated the statute by failing to design and construct *its applicable facilities to be* readily accessible to and usable by individuals with disabilities including individuals who use wheelchairs. Defendants further violated the statute by failing to design and construct their establishment in compliance with the ADA during planned alterations as described throughout this Complaint.

**81.** According to Defendants' own publicly available information, Defendants chose to design their facility in a way that is not ADA Title III compliant whatsoever. Defendants literally strategically designs, constructs and maintains their facility without any regard to the disabled. Defendants' systematic design of their applicable facility fails to afford disabled individuals the same experience that is afforded to individuals without disabilities.

**82.** To date, the Defendants' discriminating actions continue.

**83.** Plaintiffs have been obligated to retain the undersigned counsel for the filing and prosecution of this action. They are entitled to have their reasonable attorney's fees, costs and expenses paid by the Defendants pursuant to 42 U.S.C. § 12205.

**84.** Pursuant to 42 U.S.C. § 12188 this Court is authorized to enjoin these illegal actions by Defendants.

**COUNT FIVE**
**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**
**42 U.S.C. § 12182(a) and 28 C.F.R. § 36.302 (e)(1)(i)-(ii)**
*(Failure of website to show accessible features of the Riverwalk Casino Hotel)*

**85.** Plaintiffs incorporate by reference and reallege all the paragraphs above.

**86.** The ADA's legislative history provides that integration is fundamental to the purposes of the ADA. Provision of segregated accommodations, goods and services relegate persons with disabilities to be an inferior second-class citizen. *H. Rep. 101–485(III), 101st Cong., *1279 2d Sess., at 56, reprinted in 1990 U.S.C.C.A.N. 445, 479.* "*The goal is to eradicate the invisibility of the handicapped. Separate-but-equal services do not accomplish this central goal and should be rejected.*" *Id. at 50, 1990 U.S.C.C.A.N. at 473.*

**87.** Congress enacted the ADA in light of its findings that "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities." 42 U.S.C. 12101(a)(5).

**88.** However, the Internet of today did not exist when Congress originally enacted the ADA and, accordingly, neither the ADA nor the regulations the Department of Justice promulgated under the ADA specifically addresses access to Web sites. *But*

*the statute's broad and expansive nondiscrimination mandate reaches goods and services provided by covered entities on Web sites over the Internet."* 75 Fed Reg. 43,460, 46,463 See also <u>*Netflix*</u>, 869 F. Supp. 2d at 200 *(excluding web-based services would "run afoul of the purposes of the ADA and would severely frustrate Congress's intent that individuals with disabilities fully enjoy the goods, services, privileges, and advantages available indiscriminately to other members of the general public."* <u>*Carparts Distribution Center, Inc. v. Automotive Wholesaler's Association of New England, Inc.*</u>, 37 F.3d 12, 20 (1st Cir. 1994)). The "broad mandate" of the ADA and its "comprehensive character" are resilient enough to keep pace with the fact that the virtual reality of the Internet is almost as important now as physical reality alone was when the statute was signed into law. The meteoric rise of virtual reality through the Internet and its impact on communal and commercial affairs could not have been anticipated by Congress does not mean the law's application to the Internet and website is ambiguous; "the fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth". <u>*Andrews v. Blick Art Materials, LLC*</u>, No. 17-CV-767, 2017 WL 3278898, (E.D.N.Y. Aug. 1, 2017). Today, internet technology enables individuals to participate actively in their community and engage in commerce from the comfort and convenience of their home. It would indeed be a cruel irony to adopt the interpretation of the ADA espoused by <u>*Blick*</u>, which would render the legislation intended to emancipate the disabled from the bonds of isolation and segregation obsolete when its objective is increasingly within reach. Plaintiff has stated a claim under the ADA. <u>*Andrews v. Blick Art*</u>

*Materials, LLC*, No. 17-CV-767, 2017 WL 3278898, (E.D.N.Y. Aug. 1, 2017).

89. Congress expressly stated when enacting the ADA that: "…*the types of accommodation and services provided to individuals with disabilities, under all of the titles of this bill, should keep pace with the rapidly changing technology of the times*". In light of this, the United States Department of Justice issued an Advanced Notice of Proposed Rulemaking ("ANPRM") on Accessibility of Web Information and Services of State and Local Government Entities and Public Accommodations. 75 Fed Reg. 43460. The Department of Justice explained in the ANPRM that although the Department has been clear that the ADA applies to websites of public accommodations, inconsistent court decisions, differing standards for determining web accessibility, and repeated calls for Department action warranted further guidance. *Id.* at 43464. Through the ANPRM, the Department sought to explore what regulatory provisions they could propose *to make clear to entities covered by the ADA of their obligations to make their websites accessible.*

90. To address this *broad* range of discrimination in the context of public accommodations, Congress enacted Title III, which provides in part: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. 12182.

91. By its clear text, Title III requires a public accommodation to provide individuals with disabilities more than simple physical access. Congress recognized that

"individuals with disabilities continually encounter *various forms of discrimination"* including not only barriers to physical access, but also other forms of exclusion and *relegation to lesser services, programs, activities, benefits, jobs, or other opportunities*. 42 U.S.C. 12101(a)(5); see also H.R. Rep. No. 485, Pt. 2, 101st Cong., 2d Sess. 35-36 (1990) ("lack of physical access to facilities" was only one of several "major areas of discrimination that need to be addressed"); H.R. Rep. No. 485, Pt. 3, 101st Cong., 2d Sess. 54 (1990) ("It is not sufficient to only make facilities accessible and usable; this title prohibits, as well, discrimination in the provision of programs and activities conducted by the public accommodation.").

92.   For that reason, the Act applies not only to barriers to physical access to places of public accommodation, but also to any policy, practice, or procedure that operates to deprive or diminish disabled individuals' full and equal enjoyment of the privileges and services offered by the public accommodation to the public. 42 U.S.C. § 12182, 28 C.F.R. 36.302(e)(1)(i) and (ii). Thus, a public accommodation may not have a policy, practice or procedure that excludes individuals with disabilities from services. 42 U.S.C. § 12182(b)(2)(A)(ii). The Eleventh Circuit held persuasively in *Rendon v. Valleycrest Prod., Ltd*. 294 F.3d 1279, (11th Cir. 2002) that:

> "A reading of the plain and unambiguous statutory language at issue reveals that the definition of discrimination provided in Title III covers both tangible barriers (emphasis added), that is, physical and architectural barriers that would prevent a disabled person from entering an accommodation's facilities and accessing its goods, services and privileges, see 42 U.S.C. § 12182(b)(2)(A)(iv), and intangible barriers

> *(emphasis added), such as eligibility requirements and screening rules or discriminatory policies and procedures that restrict a disabled person's ability to enjoy the Defendant entity's goods, services and privileges."*

93.  The Riverwalk website and online reservation system did not allow plaintiffs to use the website and online reservation system in the same manner as individuals with disabilities, because the website and online reservation system failed to show any of the accessible features of Riverwalk, which includes but is not limited to: Defendants failing to identify and describe the accessible features of (1) the Casino, (2) the establishments common areas and its associated amenities; (3) Smiley's; (4) Magnolia Hill Buffet; (5) the gift shop; (6) the fitness center; (7) the pool; and (8) the accessible features of the guest rooms and suites themselves, much less provide them options for accessible features. Moreover, Defendants provide a plethora of services and associated benefits, including but not limited to: hotel stay packages, virtual tours of its shopping and dining variety, a variety of top-of-the-line dining options, and their players club and its associated benefits and services to able-bodied individuals, but fail to provide those same services of the accessible features of the Riverwalk to disabled individuals which relegates and otherwise segregates disabled individuals to inferior benefits and services of the Riverwalk.

94.  The Department of Justice has promulgated regulations that specifically prohibit Defendants' conduct in this case as to the Defendants' places of lodging. 28 C.F.R. 36.302(e) specifically provides:

> "(1) *Reservations made by places of lodging. A public accommodation that owns, leases (or leases to), or operates*

*a place of lodging shall, with respect to reservations made by any means, including by telephone, in-person, or through a third party –*

> (i) *Modify its policies, practices, or procedures to ensure that individuals with disabilities can make reservations for accessible guest rooms during the same hours and <u>in the same manner as</u> individuals who do not need accessible rooms;*

> (ii) *Identify and describe accessible features in the hotels and guest rooms offered through its reservations service in enough detail to reasonably permit individuals with disabilities to assess independently whether a given hotel or guest room meets his or her accessibility needs;"* (emphasis added).

95.    Defendants' website and reservation system did not allow Plaintiffs to use the system in the same manner as individuals without disabilities, because (1) the website failed to show or otherwise inform of the accessibility features at the hotel; (2) it did not offer the same type of guest rooms to the disabled as to individuals without disabilities; and (3) it failed to allow Plaintiffs and others similarly situated, to make reservations in the same manner as other individuals who do not need accessibility features. Specifically, through the reservation system Defendants only offers the disabled hotel rooms that are allegedly accessible that are standard guest rooms, without any of the choices for upgraded amenities that are offered in the non-accessible rooms. The choices for upgraded amenities include but are not limited to the floor level, rooms that are adjoining, the different types of suites and rooms, a view of the Mississippi river, a view of the city, room size, the type of

amenities offered in the room, among many other features non-disabled guests are offered, including the floor level and suites.

96.  The Defendants' reservation system did not allow Plaintiffs to make reservations in the same manner as the non-disabled because it failed to provide accessible opportunities to make reservations for the elegantly appointed rooms and luxurious suites that Riverwalk offers, including but not limited to (1) a Deluxe King Room; (2) a Deluxe Two Queen Room; (3) a Deluxe King Suite; (4) a Deluxe King Smoking Room; (5) a Deluxe Two Queen Smoking Room; (6) a Deluxe Two Queen Suite.

97.  To date, the Defendants' discriminating actions continue.

98.  As pled above, Churchill Downs Incorporated, "owns" the public internet website riverwalkvicksburg.com and "operates" the world-wide website services that are available to the public at Riverwalk. It is therefore, pursuant to 42 U.S.C. § 12182, responsible for creating, implementing, and maintaining policies, practices and procedures, and further, providing auxiliary aids and services to its web-based services, as alleged above.

99.  Plaintiffs have been obligated to retain the undersigned counsel for the filing and prosecution of this action. They are entitled to have their reasonable attorney's fees, costs and expenses paid by the Defendants pursuant to 42 U.S.C. § 12205.

100.  Pursuant to 42 U.S.C. § 12188 this Court is authorized to enjoin these illegal actions by Defendants.

**COUNT SIX**
**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**
**42 U.S.C. § 12182(b)(2)(A)(i)**
*(Use of technology that tends to screen out individuals with disabilities)*

101.    Plaintiffs incorporate by reference and reallege all the paragraphs above.

102.    The ADA's legislative history provides that integration is fundamental to the purposes of the ADA. Provision of segregated accommodations, goods and services relegate persons with disabilities to be an inferior second-class citizen. *H. Rep. 101–485(III), 101st Cong., \*1279 2d Sess., at 56, reprinted in 1990 U.S.C.C.A.N. 445, 479.* "*The goal is to eradicate the invisibility of the handicapped. Separate-but-equal services do not accomplish this central goal and should be rejected.*" *Id. at 50, 1990 U.S.C.C.A.N. at 473.*

103.    Congress enacted the ADA in light of its findings that "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities."  42 U.S.C. 12101(a)(5).

104.    However, the Internet today did not exist when Congress originally enacted the ADA and, accordingly, neither the ADA nor the regulations the Department of Justice promulgated under the ADA specifically addresses access to Web sites. *But the statute's broad and expansive nondiscrimination mandate reaches goods and services provided by covered entities on Web sites over the Internet.*" 75 Fed Reg.

43,460, 46,463 See also *Netflix,* 869 F. Supp. 2d at 200 *(excluding web-based services would "run afoul of the purposes of the ADA and would severely frustrate Congress's intent that individuals with disabilities fully enjoy the goods, services, privileges, and advantages available indiscriminately to other members of the general public." Carparts Distribution Center, Inc. v. Automotive Wholesaler's Association of New England, Inc.,* 37 F.3d 12, 20 (1st Cir. 1994)).

105.  Congress expressly stated when enacting the ADA that: "…*the types of accommodation and services provided to individuals with disabilities, under all of the titles of this bill, should keep pace with the rapidly changing technology of the times*". In light of this, the United States Department of Justice issued an Advanced Notice of Proposed Rulemaking ("ANPRM") on Accessibility of Web Information and Services of State and Local Government Entities and Public Accommodations. 75 Fed Reg. 43460.  The Department of Justice explained in the ANPRM that although the Department has been clear that the ADA applies to websites of public accommodations, inconsistent court decisions, differing standards for determining web accessibility, and repeated calls for Department action warranted further guidance.  *Id.* at 43464.  Through the ANPRM, the Department sought to explore what regulatory provisions they could propose *to make clear to entities covered by the ADA of their obligations to make their websites accessible*.

106.  To address this *broad* range of discrimination in the context of public accommodations, Congress enacted Title III, which provides in part: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or

accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. 12182.

107.  By its clear text, Title III requires a public accommodation to provide individuals with disabilities more than simple physical access. Congress recognized that "individuals with disabilities continually encounter *various forms of discrimination"* including not only barriers to physical access, but also other forms of exclusion and *relegation to lesser services, programs, activities, benefits, jobs, or other opportunities*. 42 U.S.C. 12101(a)(5); see also H.R. Rep. No. 485, Pt. 2, 101st Cong., 2d Sess. 35-36 (1990) ("lack of physical access to facilities" was only one of several "major areas of discrimination that need to be addressed"); H.R. Rep. No. 485, Pt. 3, 101st Cong., 2d Sess. 54 (1990) ("It is not sufficient to only make facilities accessible and usable; this title prohibits, as well, discrimination in the provision of programs and activities conducted by the public accommodation.").

108.  For that reason, the Act applies not only to barriers to physical access to places of public accommodation, but also to any policy, practice, or procedure that operates to deprive or diminish disabled individuals' full and equal enjoyment of the privileges and services offered by the public accommodation to the public. 42 U.S.C. § 12182. Thus, a public accommodation may not have a policy, practice or procedure that excludes individuals with disabilities from services. 42 U.S.C. § 12182(b)(2)(A)(ii). The Eleventh Circuit held in *Rendon v. Valleycrest Prod., Ltd.* 294 F.3d 1279, (11th Cir. 2002) that:

> *"A reading of the plain and unambiguous statutory language at issue reveals that the definition of discrimination provided in Title III covers both <u>tangible barriers</u> (emphasis added), that is, physical and architectural barriers that would prevent a disabled person from entering an accommodation's facilities and accessing its goods, services and privileges, see 42 U.S.C. § 12182(b)(2)(A)(iv), and <u>intangible barriers</u> (emphasis added), such as eligibility requirements and screening rules or discriminatory policies and procedures that restrict a disabled person's ability to enjoy the Defendant entity's goods, services and privileges.*

109.  Pursuant to 42 U.S.C. § 12182(b)(2)(A)(i) discrimination includes:

> *The imposition or application of eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any goods, services, facilities, privileges, advantages, or accommodations, unless such criteria can be shown to be necessary for the provision of the goods, services, facilities, privileges, advantages, or accommodations being offered.*

110.  Pursuant to 42 U.S.C. § 12182(b)(2)(A)(iii) discrimination includes:

> *A failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden.*

111.  The plain language of these statutory provisions applies to discrimination in offering the goods and services ''of'' a place of public accommodation or the

services, programs, and activities ''of'' a public entity, rather than being limited to those goods and services provided ''at'' or ''in'' a place of public accommodation or facility of a public entity.

112. A place of public accommodation also may not refuse to make reasonable modifications to a policy or practice that has the consequence of denying such individuals access to its services. Nor can a public accommodation refuse to make modifications to a policy or practice that tends to deny individuals with disabilities access to the goods and services of the public accommodation.

113. Defendants utilize the Riverwalk online website and reservation system to screen out disabled individuals, so that they are not informed of the accessibility features at the hotel as well as not offered the same type of guest rooms as other individuals without disabilities. The screening out process specifically involves only offering hotel rooms that are allegedly accessible that are standard guests rooms without any upgraded amenities that are offered in the non-accessible rooms. The upgraded amenities include but are not limited to the floor level, rooms that are adjoining, the different types of suites and rooms, a view of the Mississippi river, view of the city, room size, the type of amenities offered in the room, among many other features non-disabled guests are offered, including the floor level and suites.

114. The Riverwalk online website served to screen Plaintiffs in that they were unable to determine any of the accessible features of Riverwalk, which includes but is not limited to: Defendants failing to identify and describe the accessible features of (1) the Casino, (2) the establishments common areas and its associated amenities; (3) Smiley's; (4) Magnolia Hill Buffet; (5) the gift shop; (6) the fitness center; (7) the

pool; and (8) the accessible features of the guest rooms and suites themselves, much less provide them options for accessible features. Moreover, Defendants provide a virtual tour of the features of Riverwalk including but not limited to Riverwalk's variety of restaurants and shopping to able-bodied individuals but fails to make a virtual tour available of the accessible features of Riverwalk to disabled individuals.

115. The reservation system served to screen Plaintiffs to only allow them to book non-accessible guest rooms on the website, or alternatively, require Plaintiffs to make a request for accessible rooms after they made reservations for a non-accessible room. The Defendants' reservation system did not offer Plaintiffs any of the types of elegantly appointed rooms and luxurious suites that Riverwalk offers, including but not limited to (1) a Deluxe King Room; (2) a Deluxe Two Queen Room; (3) a Deluxe King Suite; (4) a Deluxe King Smoking Room; (5) a Deluxe Two Queen Smoking Room; (6) a Deluxe Two Queen Suite.

116. Moreover, Defendants' online website, its reservation system, and further exemplified by its non-compliant facility screened out Plaintiffs by failing to ensure that accessible guest rooms are held for Plaintiffs and further, failing to make reasonable modifications in their policies, practices, or procedures, so that Plaintiffs are not excluded, denied services, segregated or otherwise treated differently than other individuals without disabilities.

117. The ADA and the Title III regulation, since their enactment and promulgation, have always required that public accommodations provide effective communication to persons with disabilities through the provision of auxiliary aids and services. A

commercial transaction between a customer and a public accommodation requires communication between the two, and in this action, Defendants have chosen to use an online reservation system by which it communicates with able-bodied individuals to complete commercial transactions. Whereas, Defendants have chosen to use its reservation system and online website as a means by which to not communicate and transact business with disabled individuals which is contrary to the broad mandate of the ADA which prohibits not only outright exclusion but also unnecessary differential treatment. See 42 U.S.C. §§ 12182(a), (b(1)(A), (b)(2)(A)(iii). Congress expressly stated when passing the ADA, "…*the types of accommodation and services provided to individuals with disabilities, under all of the titles of this bill, should keep pace with the rapidly changing technology of the times[,]" and that technological advances "may require public accommodations to provide auxiliary aids and services in the future which today would not be required because they would be held to impose undue burdens on such entities*." *See* H.R. Rep. No. 485, pt. 2, at 108 (1990).

118.    These are precisely the sorts of claims Title III was intended to cover. The process for selecting an ADA accessible hotel room is no different than the implementation of eligibility criteria in other contexts that are clearly covered by the Act. For example, there is no question that the administration of admission testing by a private secondary school falls within the scope of Title III. See Section 12189; 28 C.F.R. 36.309. There would be little question that the ADA would apply, and would be violated, if Defendants screened guests as they entered the hotel lobby, sending home guests on the grounds that they were deaf or physically disabled or suffered

from diabetes or any other disability. See 28 C.F.R. Pt. 36 App. B, p. 640 (commentary to 28 C.F.R. 36.301) ("*It would violate this section to establish exclusive or segregative eligibility criteria that would bar, for example, all persons who are deaf from playing on a golf course or all individuals with cerebral palsy from attending a movie theater*."). That disabled individuals are screened out by an automated hotel reservation system, rather than by an admission policy administered at the studio door is of no consequence under the statute.

119.   Defendants' failure to modify this practice necessary to ensure Plaintiffs the full and equal enjoyment of Riverwalk has resulted in the complete exclusion from making reservations online and in the same manner as other individuals who do not have disabilities.  See § 12182(b)(2)(A)(ii)-(iii).

120.   The screening process violates the Americans with Disabilities Act by directly and intentionally screening out disabled individuals for the purpose of preventing the disabled from being afforded the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations, at the Riverwalk Casino Hotel. 42 U.S.C. § 12182(b)(2)(A)(i).

121.   The screening of individuals with disabilities is not necessary to provide accommodations because no accommodations are provided.

122.   To date, the Defendants' discriminating actions continue.

123.   As pled above, Churchill Downs Incorporated, "owns" the public internet website riverwalkvicksburg.com and "operates" the world-wide website services that are available to the public at Riverwalk. It is therefore, pursuant to 42 U.S.C. § 12182,

responsible for creating, implementing, and maintaining policies, practices and procedures, and further, providing auxiliary aids and services to its web-based services, as alleged above.

124.   Plaintiffs have been obligated to retain the undersigned counsel for the filing and prosecution of this action. They are entitled to have their reasonable attorney's fees, costs and expenses paid by the Defendants pursuant to 42 U.S.C. § 12205.

125.   Pursuant to 42 U.S.C. § 12188 this Court is authorized to enjoin these illegal actions by Defendants.

**COUNT SEVEN**
**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**
**42 U.S.C. § 12182(a) and 28 C.F.R. § 36.302 (e)(1)(i)-(ii)**
***(Failure to Integrate Website Accessibility)***

126.   Plaintiffs incorporate by reference and reallege all the paragraphs above.

127.   The ADA's legislative history provides that integration is fundamental to the purposes of the ADA. Provision of segregated accommodations, goods and services relegate persons with disabilities to be an inferior second-class citizen. *H. Rep. 101–485(III), 101st Cong., *1279 2d Sess., at 56, reprinted in 1990 U.S.C.C.A.N. 445, 479.* "*The goal is to eradicate the invisibility of the handicapped. Separate-but-equal services do not accomplish this central goal and should be rejected.*" *Id. at 50, 1990 U.S.C.C.A.N. at 473.*

128.   Congress enacted the ADA in light of its findings that "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make

modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities." 42 U.S.C. 12101(a)(5).

129.  Legislative history indicates that websites of public accommodations are covered by Title III. Although the internet did not exist when Congress enacted the ADA in 1990, the legislative histories state that Congress intended to include the use of new and evolving technologies by public accommodations and other covered entities in meeting their ADA obligations.  Consequently, it is consistent with Congressional intent to include within Title III's coverage the goods and services provided by public accommodations through their websites. *See Nat'l Fed'n of the Blind v. Scribd*, 97 F.Supp. 3d 565, 574 (D. Vt. 2015).

130.  The Justice Department has long affirmed the application of Title III to the websites of public accommodations. *The statute's broad and expansive nondiscrimination mandate reaches goods and services provided by covered entities on Web sites over the Internet."* 75 Fed Reg. 43,460, 46,463 See also *Netflix*, 869 F. Supp. 2d at 200 *(excluding web-based services would "run afoul of the purposes of the ADA and would severely frustrate Congress's intent that individuals with disabilities fully enjoy the goods, services, privileges, and advantages available indiscriminately to other members of the general public." Carparts Distribution Center, Inc. v. Automotive Wholesaler's Association of New England, Inc.,* 37 F.3d 12, 20 (1st Cir. 1994).

131.  Today, internet technology enables individuals to participate actively in their community and engage in virtually all forms of commerce from the comfort and

convenience of their home, to the extent that virtual reality through the internet is almost as important as physical reality in brick-and-mortar constructed public accommodations, in pursuing commerce from public accommodations. That websites were not explicitly written into the ADA at its passage in the early 1990s but are nevertheless covered does not indicate ambiguity in the ADA, but rather the breadth of the ADA. *Andrews v. Blick Art Materials, LLC*, No. 17-CV-767, 2017 WL 3278898, (E.D.N.Y. Aug. 1, 2017).

132.  Defendants did not allow Plaintiffs to use the website in the same manner as individuals without disabilities, because the website fails to integrate alternative platforms that enable disabled individuals who have limited use of their hands the opportunity to use the alternative platforms to navigate and select items on the page. The able-bodied online website user can only use a mouse to navigate, whereas individuals who have limited use of their hands cannot use assistive technology to navigate through the website. Moreover, Defendants provide a plethora of services and associated benefits, including but not limited to: promotions, dining options, casino features, access to rewards, among other services to able-bodied individuals, but fails to provide those same services to disabled individuals which relegates and otherwise segregates disabled individuals to inferior benefits and services of Riverwalk.

133.  The design of Defendants' web site impedes Plaintiffs and others similarly situated from accessing the services, privileges and accommodations afforded able-bodied patrons through the web platform. The website fails to integrate alternative access methods that allow a person with limited manual dexterity to access the

information and navigate the web site without being able to use a mouse. That is, the website design does not provide for functions to be carried out using a keyboard or voice input. On its website, Defendants provide a plethora of services and associated benefits, including but not limited to: promotions, dining options, casino features, access to rewards, among other services to the general public, but fails to provide those same services to persons with disabilities. Such actions relegate and otherwise segregate persons with disabilities to inferior benefits and services offered by Riverwalk.

134.   As pled previously, intangible barriers to access are prohibited, just as tangible barriers are prohibited.

135.   The actions by the Defendants violate:

   **(1)** 42 U.S.C. § 12182(a), because its actions deny Plaintiffs full and equal enjoyment of Defendants' goods and services;

   **(2)** 42 U.S.C. § 12182(b)(1)(A)(i), because Defendants' actions deny Plaintiffs equal participation in goods and services offered by the Defendants;

   **(3)** 42 U.S.C. § 12182(b)(1)(A)(ii) and (iii), because Plaintiffs are provided both separate and unequal benefits of Defendants' goods and services;

   **(4)** 42 U.S.C. § 12182(b)(1)(B), because Defendants do not provide their goods and services in the most integrated setting appropriate;

   **(5)** 28 C.F.R. 36.303(c), because Defendants have failed to provide auxiliary aids and services where necessary to ensure effective communication with the disabled Plaintiffs.

136.   Plaintiffs do not allege that there are a particular set of mandatory regulations for websites that establish compliance or non-compliance as a matter of law. Plaintiffs plead, consistent with the Department of Justice determinations, that in achieving such conformance and usability of websites by individuals with disabilities, Defendants should rely upon the User Agent Accessibility Guidelines ("UAGG") 1.0, the Authorizing Tool Accessibility Guidelines ("ATAG") 2.0, and the Guidance on Applying WCAG 2.0 to Non-Web Information and Communications Technologies ("WCAH2ICT"), published by the W3C, as well as guidance published by the W3C's Mobile Accessibility Task Force, as stated guidance published by the W3C's Mobile Accessibility Task Force.

137.   To date, the Defendants' discriminating actions continue.

138.   As pled above, Churchill Downs Incorporated, is the "owner" of the public internet website riverwalkvicksburg.com and "operates" the world-wide websites services that are available to the public at Riverwalk. It is therefore, pursuant to 42 U.S.C. § 12182, responsible for creating, implementing, and maintaining policies, practices and procedures, and further, providing auxiliary aids and services to its web-based services, as alleged above. 42 U.S.C. § 12182.

139.   Plaintiffs have been obligated to retain the undersigned counsel for the filing and prosecution of this action. They are entitled to have their reasonable attorney's fees, costs and expenses paid by the Defendants pursuant to 42 U.S.C. § 12205.

140.   Pursuant to 42 U.S.C. § 12188 this Court is authorized to enjoin these illegal actions by Defendants.

**COUNT EIGHT**
**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, TITLE III**
**42 U.S.C. § 12182(2)(A)(iii)**
*(Failure to Provide Services Necessary to*
*Ensure Equal Access to Innovative Technology)*

141. Plaintiffs incorporate by reference and reallege all the paragraphs above.

142. The ADA was the most sweeping civil rights legislation since the Civil Rights Act of 1964. When it was enacted Congress had no conception of how the Internet would change global commerce. "[W]e were not communicating by e-mail, blog, or tweet; we were not filling virtual shopping carts with clothes, books, music, and food; we weren't banking, renewing our driver's licenses, paying taxes or registering for and taking classes online. Congress could not have foreseen these advances in technology. Despite Congress' great cognitive powers, it could not have foreseen these advances in technology which are now an integral part of our daily lives. Yet Congress understood that the world around us would change and believed that the nondiscrimination mandate contained in the ADA should be broad and flexible enough to keep pace." *Achieving the Promises of the Americans with Disabilities Act in the Digital Age—Current Issues, Challenges and Opportunities: Hearing before the H. Subcomm. on the Constitution, Civil Rights, and Civil Liberties of the House Comm. on the Judiciary,* 111th Cong., 2d Sess. 111–95 (2010).

143. Since the internet plays such a critical role in the personal and commercial lives of Americans, excluding disabled persons from access to covered entities that use the internet and mobile applications as a means of reaching the public would defeat the purpose of this important civil rights legislation. In today's society, places of public

accommodation are increasingly using mobile applications ("mobile apps") to provide services, benefits and goods more effectively to the public and expand the services the public accommodation has to offer in new ways. These services that are provided via a public accommodation for web applications, mobile application, and hybrid applications ("mobile platform") also need to be provided to disabled individuals.

144.    ADA Title III states that discrimination includes "a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden." 42 U.S.C. § 12182(b)(2)(A)(iii). Regulations promulgated by DOJ implementing Title III require public accommodations to provide "appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c)(1). Auxiliary aids and services include . . . *accessible electronic and information technology*, among other methods. 28 C.F.R. § 36.303(b). Auxiliary aids and services also includes acquisition or modification of equipment or devices, and other similar services and actions. 28 C.F.R. 36.303(b)(3)-(4).

145.    The plain language of these statutory provisions applies to discrimination in offering the goods and services ''of'' a place of public accommodation or the services, programs, and activities ''of'' a public entity, rather than being limited to

those goods and services provided ''at'' or ''in'' a place of public accommodation or facility of a public entity.

146.   The ADA and the Title III regulation, since their enactment and promulgation, have always required that public accommodations provide effective communication to persons with disabilities through the provision of auxiliary aids and services. A commercial transaction between a customer and a public accommodation requires communication between the two. Defendants have chosen to provide a service through a mobile application to promotions, dining options, casino features, access to rewards, among many other services through the mobile platform. The Defendants communicate all of that to able-bodied individuals as a service. Yet, Defendants' use of their mobile application and the services they offer through the application does *not* communicate and provide services to the disabled individuals. This is contrary to the broad mandate of the ADA which prohibits not only outright exclusion but also unnecessary differential treatment. See 42 U.S.C. §§ 12182(a), (b(1)(A), (b)(2)(A)(iii). Congress expressly stated when passing the ADA, "...*the types of accommodation and services provided to individuals with disabilities, under all of the titles of this bill, should keep pace with the rapidly changing technology of the times[,]" and that technological advances "may require public accommodations to provide auxiliary aids and services in the future which today would not be required because they would be held to impose undue burdens on such entities*." *See* H.R. Rep. No. 485, pt. 2, at 108 (1990).

147.   The unlawful implementation of eligibility criteria in other contexts that are clearly covered by the Act is analogous to the Defendants' effective screening of Plaintiff

from using its mobile app. For example, there is no question that the administration of admission testing by a private secondary school falls within the scope of Title III. See Section 12189; 28 C.F.R. 36.309. There would be little question that the ADA would apply, and would be violated, if Defendants screened guests as they entered, sending home guests on the grounds that they were deaf or physically disabled or suffered from diabetes or any other disability. See 28 C.F.R. Pt. 36 App. B, p. 640 (commentary to 28 C.F.R. 36.301) ("*It would violate this section to establish exclusive or segregative eligibility criteria that would bar, for example, all persons who are deaf from playing on a golf course or all individuals with cerebral palsy from attending a movie theater*."). ("*An insurance company can no more refuse to sell a policy to a disabled person over the Internet than a furniture store can refuse to sell furniture to a disabled person who enters the store'. Accordingly, the site of the sale is irrelevant. All that matters is whether the good or service is offered to the public.* (Nat'l Fed'n of the Blind. Scribd Inc._, 97 F. Supp. 3d 565 (D. Vt. 2015). The Defendants' failure to permit or include assistive technology in relation to their mobile app directly and physically screens and prevents the Plaintiff from being able to use the mobile app, just as if Defendants in their establishment placed items outside the Plaintiffs' reach and said Plaintiffs cannot have the items unless Plaintiffs can get the items for themselves.

148.   In our contemporary technological society, "excluding businesses that sell services through the Internet from the ADA would 'run afoul of the purposes of the ADA and would severely frustrate Congress's intent that individuals with disabilities fully enjoy the goods, services, privileges, and advantages available

indiscriminately to other members of the general public." *Netflix*, 869 F.Supp.2d at

200 (quoting *Carparts,* 37 F.3d at 20). (quoting *Nat'l Fed'n of the Blind. Scribd*

*Inc.*, 97 F. Supp. 3d 565 (D. Vt. 2015).

149. Defendants diminish Plaintiffs' rights under the ADA to fully participate in all

aspects of society, which is counter to Congress' goal. Defendants' ableism, as

described throughout the Complaint, is excluding Plaintiff from equality of

opportunity, full participation, independent living, and economic self-sufficiency

and in doing so excludes Plaintiff from a plethora of goods and services that are

offered through the mobile platform which includes but is not limited to the

following:

(1) Defendants are excluding, denying services, and otherwise segregating

Plaintiffs from all of the benefits and services Defendants offer through

their mobile apps as a result of their failure to modify their mobile

application platform to allow assistive technology, which includes, but is

not limited to, voice recognition, alternative input methods, assistive touch

functions, among other accessibility methods that Plaintiffs require, to

compete on an equal basis and maintain independent self-sufficiency;

(2) Defendants are excluding, denying services, or otherwise segregating

Plaintiffs, because unlike able bodied individuals, disabled individuals are

excluded from Defendants' services that enables individuals to view

promotions through the mobile apps;

(3) Defendants are excluding, denying services, or otherwise segregating

Plaintiffs, because unlike able bodied individuals, disabled individuals are

excluded from Defendants' services that enables individuals to view the various dining options at Riverwalk through the mobile apps;

**(4)**   Defendants are excluding, denying services, or otherwise segregating Plaintiffs, because unlike able bodied individuals, disabled individuals are excluded from Defendants' services that enables individuals to view the various casino features and options at Riverwalk through the mobile apps;

**(5)**   Defendants are excluding, denying services, or otherwise segregating Plaintiffs, because unlike able bodied individuals, disabled individuals are excluded from Defendants' services that enables individuals to view the various hotel features and options at Riverwalk through the mobile apps;

**(6)**   Defendants are excluding, denying services, or otherwise segregating Plaintiffs, because unlike able bodied individuals, disabled individuals are excluded from Defendants' services that enables individuals to view and access rewards through the mobile apps;

**(7)**   Defendants are excluding, denying services, or otherwise segregating Plaintiffs, because unlike able bodied individuals, disabled individuals are excluded from Defendants' services that enables individuals to access and view all of the benefits of Riverwalk through the use of the mobile apps;

**(8)**   Defendants are excluding, denying services, and otherwise segregating Plaintiffs as a result of their failure to modify equipment, devices and/or other similar services. 28 *C.F.R.* § 36.303(b)(3)-(4).

(9)  Defendants are excluding, denying services, or otherwise segregating Plaintiffs of all the goods and services offered on its mobile apps as a result of Defendants' failure to design their mobile apps that enable alternative assistive technology;

150.  The design of Defendants' mobile app impedes Plaintiffs and others similarly situated from accessing the services, privileges and accommodations afforded patrons through the mobile app. The mobile app fails to integrate alternative access methods that allow a person with limited manual dexterity in their hands to access the information and navigate the mobile app.

151.  The actions by the Defendants violate:

(1)  42 U.S.C. § 12182(a), because Defendants' actions deny Plaintiffs full and equal enjoyment of Defendants' goods and services;

(2)  42 U.S.C. § 12182(b)(1)(A)(i), because Defendants' actions deny Plaintiffs equal participation in goods and services offered by the Defendants;

(3)  42 U.S.C. § 12182(b)(1)(A)(ii) and (iii), because Plaintiffs are provided both separate and unequal benefits of Defendants' goods and services;

(4)  42 U.S.C. § 12182(b)(1)(B), because Defendants do not provide their goods and services in the most integrated setting appropriate;

(5)  28 C.F.R. 36.303(c), because Defendants have failed to provide auxiliary aids and services where necessary to ensure effective communication with the disabled Plaintiffs.

152.  Plaintiffs do not allege that there are a particular set of mandatory regulations for mobile applications that establish compliance or non-compliance as a matter of law. Plaintiffs plead, consistent with the Department of Justice determinations, that in achieving such conformance and usability of mobile apps by individuals with disabilities, Defendants should rely upon the User Agent Accessibility Guidelines ("UAGG") 1.0, the Authorizing Tool Accessibility Guidelines ("ATAG") 2.0, and the Guidance on Applying WCAG 2.0 to Non-Web Information and Communications Technologies ("WCAH2ICT"), published by the W3C, as well as guidance published by the W3C's Mobile Accessibility Task Force, as stated guidance published by the W3C's Mobile Accessibility Task Force.

153.  To date, the Defendants' discriminating actions continue.

154.  As pled above, Churchill Downs Incorporated, "owns" and "operates" the Riverwalk Casino mobile application and its goods and services offered on the mobile app, and is therefore, pursuant to 42 U.S.C. § 12182, responsible for creating, implementing, and maintaining policies, practices and procedures, as alleged above.

155.  Plaintiffs have been obligated to retain the undersigned counsel for the filing and prosecution of this action. They are entitled to have their reasonable attorney's fees, costs and expenses paid by the Defendants pursuant to 42 U.S.C. § 12205.

156.  Pursuant to 42 U.S.C. § 12188 this Court is authorized to enjoin these illegal actions by Defendants.

**WHEREFORE**, premises considered, Hope Elly and John Smith demand judgment against the Defendants on Counts One through Eight and requests the following injunctive and declaratory relief:

1. That the Court declare that the property owned, and business operated by the Defendants as well as all Defendants' illegal actions described herein violate the Americans with Disabilities Act, as more particularly described above;

2. That the Court enter an order enjoining the Defendants to alter the facility to make it accessible to and usable by individuals with disabilities to the full extent required by Title III of the ADA, to comply with 42 U.S.C. § 12182(b)(2)(A)(iv) and its implementing regulations, as stated in Count One;

3. That the Court enter an order, in accordance with Count Two, directing the Defendants to modify their policies, practices, and procedures both to remedy the numerous ADA violations outlined above, in violation of 42 U.S.C. § 12182(b)(2)(A)(ii), and to permanently enjoin the Defendants to make their business practices consistent with ADA Title III in the future;

4. That the Court enter an order directing the Defendants to provide Plaintiffs full and equal access both to the Riverwalk experience and to the use of the Riverwalk facility, and further order the Defendants to maintain the required accessible features at the establishment so that Plaintiffs and others similarly situated are offered the experience that is offered to non-disabled individuals, as stated in Count Three;

5.  That the Court enter an Order directing the Defendants to evaluate and neutralize their policies, practices, and procedures towards persons with disabilities for such reasonable time so as to allow Defendants to undertake and complete corrective procedures;

6.  That the Court enjoin the Defendants to remediate Riverwalk to the proper level of accessibility required for the design and construction of the facility for first occupancy, as stated in Count Four;

7.  That the Court enter an order enjoining Defendants from using the reservation system to screen and defer to another location individuals with disabilities, as stated in Count Five;

8.  That the Court enter an order enjoining compliance with federal regulations and statutes as to the adequacy of the reservation system for individuals with disabilities, as stated in Count Six;

9.  That the Court enter an order requiring that Defendants adopt and implement a website accessibility policy and take the necessary actions to make their website accessible to the Plaintiffs, as particularly described in Count Seven;

10. That the Court enter an order requiring Defendants to place on their homepage a statement concerning its website accessibility policy; provide training to all their workers and associates who write or develop programs or code; and test their website quarterly to identify and repair any incidence of nonconformance;

11. That the Court enter an order requiring Defendants to adopt and implement a mobile application accessibility policy and take the necessary actions to make their mobile

application accessible to the Plaintiff, as particularly described in Count Eight;

12.   That the Court enter an order requiring Defendants to place on their mobile application a statement covering their mobile application accessibility policy; provide training to all their workers and associates who write or develop the programs and code for the mobile application; and test the mobile application quarterly to identify and repair any indication of non-conformance;

13.   That the Court award reasonable attorney's fees, costs, (including expert fees) and other expenses of suit, to Plaintiffs; and

14.   That the Court award such other, further, and different relief as it deems necessary, just, and proper.

Respectfully Submitted, this the 14th Day of February 2019.

/s/_____

**BRADLEY D. MCADORY**
**BPR # MS-10545**
ADA Group LLC
4001 Carmichael Road, Suite 570
Montgomery, Alabama 36106
334.819.4030 p
334.819.4032 f
BDM@ADA-Firm.com
*Attorney for the Plaintiffs*

## CERTIFICATE OF SERVICE

This is to certify that I have this day filed with the Clerk of Court the aforementioned Complaint for service of process by USPS mail or electronic mail, postage prepaid and properly addressed this 14th day of February 2019 to the following:

**MAGNOLIA HILL, LLC**
c/o C T Corporation System
Attn.: Registered Agent
645 Lakeland East Drive, Suite 101
Flowood, MS 39232

**CHURCHILL DOWNS INCORPORATED**
c/o C T Corporation System
Attn.: Registered Agent
645 Lakeland East Drive, Suite 101
Flowood, MS 39232

/s/

**BRADLEY D. MCADORY**
**BPR # MS-10545**
ADA Group LLC
4001 Carmichael Road, Suite 570
Montgomery, Alabama 36106
334.819.4030 p
334.819.4032 f
BDM@ADA-Firm.com
*Attorney for the Plaintiffs*